Philip SHORE and Ann E. Shore, John K. Wales and Iryene L. Wales, George F. Milliken and Virginia Milliken, Joseph D. Bennett and Virginia H. Bennett, H. V. Monahan and Mary Pearson Monahan, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18319.

United States Court of Appeals
Fifth Circuit.

Feb. 6, 1961.

John J. Trenam, Sherwin P. Simmons (of Fowler, White, Gillen, Humkey & Trenam), Tampa, Fla., for petitioners.

Karl Schmeidler, A. F. Prescott, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Claude R. Marshall, Sp. Atty., and Hart H. Spiegel, Chief Counsel, I. R. S., Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for respondent.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal from a decision of the Tax Court presents the question whether distributions to American stockholders of a Cuban corporation were to be treated as capital gains under 26 U.S.C.A. § 115(c), (1939 Code), or as ordinary income. The Tax Court held them to be ordinary income and the Taxpayers appeal.[1]

Actually the record is substantially undisputed so far as the underlying facts are concerned. Milliken (see note 1) was obviously the driving force in setting up the corporation. He was a principal stockholder in a steamship company (In-

---

1. This case consolidates the petitions and decisions for all of such American stockholders (and their wives)

George F. Milliken
H. V. Monahan
Joseph D. Bennett
John K. Wales
Philip Shore

tercontinental) which had a very favorable relationship for transporting various Chrysler automobiles from United States Gulf ports to Cuba. Intercontinental operated as a non-conference carrier [2] and for some reason not here disclosed, but presumably growing out of its worldwide shipping problems, Chrysler insisted that these automobiles be moved to Cuba by a carrier who was a member of the Gulf-Havana Steamship Conference. Since Intercontinental did not desire to withdraw from its operations as a non-conference carrier, it was necessary to establish a new company. Milliken undertook to organize the new Cuban corporation, Vapores.[3] To make transportation of their automobiles under the presumably higher conference tariffs attractive to these Cuban automobile importers, it was agreed that the importers would have a 40% stock ownership in Vapores. The remaining 60% was owned by Milliken and his associates (see note 1, supra). Milliken was president of Vapores and he held all of the 60% American stock under a 10-year voting trust.

Operations commenced in 1951 and soon proved to be extremely profitable. Vapores owned no vessels. All of its bottoms were procured under charter. It carried automobiles to Cuba and on the homeward leg sugar to the United States.

In late 1951 the constantly mounting cash surplus was becoming a serious bone of contention between the two groups of stockholders. The Cubans wanted to get their share of earnings out to them in a realizable form especially since this represented increased shipping costs. The American group, undoubtedly conscious always of the specter of dividend taxability, did not want any distribution. On the contrary, they desired to retain earnings for investment in a vessel or other capital assets. A stockholders' meeting was called in January 1952 to discuss this problem and its solution. By this time cash surplus exceeded $175,000. The differences were marked and positive and the discussions were apparently strenuous. It was the sense of the January meeting that decision would be postponed until the end of 1952.

It was not a matter which could be forced peremptorily by the American group through exertion of sheer majority control. The Chrysler business was effectually controlled by the Cuban minority group and a solution acceptable to all had to be found.

By June 1952 the problem was becoming more aggravated. Earnings had now accumulated to approximately $275,000. Another meeting was called and held on June 4, 1952. A dominant character in these proceedings was Dr. Mestre, a Cuban lawyer, secretary and general counsel for Vapores. He had not only to guard the legality of what the parties ultimately determined, but to the normal complications flowing from the omnipresence of the United States taxing authorities, he had also to reckon with the Cuban tax and corporate law, and some rather vaguely described administrative problems presumably with Cuban authorities who would likely show up when large amounts of cash were distributed in dissolution of a company.

At the June meeting it was decided that to satisfy the demands of the Cubans for realization of earnings, the corporation would be liquidated. The target date was set at September 30, 1952 as this would correspond with the advent of the new automobile models. In the corporate action taken, no formal plan of liquidation was adopted. This was no oversight. This was deliberately done since Cuban law requires completion and report of liquidation within thirty days. In order to permit distribution of the cash, Dr. Mestre recommended, and the corporation adopted, the plan of the corporation making loans to each stockholder in proportion to his stockholding. The notes were payable on or before De-

2. See 46 U.S.C.A. § 814, § 15 of the Shipping Act of 1916; Federal Maritime Board v. Isbrandtsen Co., Inc., 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926, 1958 A.M.C. 1196.

3. Compania de Vapores, Insco, S.A.

cember 10, 1952 and carried 1% interest. These notes would meet the demands for immediate cash and at the same time assure return if, by some contingency, final liquidation could not be carried out or if the distributions turned out to be excessive in amount.

Milliken, as record stockholder of the 60% American group executed such a note and received $140,000 on July 30, 1952, which was augmented by two subsequent distributions on September 21 and October 27, 1952, totaling $10,000. He did not, however, redistribute this to the beneficial owners, but invested the money in United States Government bonds. At a special meeting of the Board of Directors of Vapores August 20, 1952, Milliken and Monahan resigned as officers and directors. In addition Milliken formally offered all of his voting trust stock for sale to Vapores. These resignations and the offer to "sell" the 840 shares of stock were approved by formal corporate resolution which recognized that by such transaction, such shares would "be totally cancelled and * * * the * * * capital reduced and amortized" accordingly.

On or before December 2, 1952, Milliken had formally surrendered the Vapores stock to the Company and on that day he received $38,697.60 in cash and a simultaneous credit on the corporate books of $150,000 against the prior "loan" for like amount. In the meantime all business activities of the corporation had ceased by October 27, 1952.[4]

---

4. The final distributive value of each share was $224.64. From June 4, 1952 to date of final liquidating dividend December 12, 1952, additions to cash did not exceed $40,000:

| | |
|---|---|
| Total Distributions to Americans (60%) | $188,697.60 |
| Distribution to Cubans (40%) | 125,798.40 |
| Total | $314,496.00 |
| Cash accumulation @ June 4, 1952 | 275,000.00 |
| Maximum additions to cash from all sources June to December 1952 | $ 39,496.00 |

---

The Commissioner (and Tax Court) recognize that the cash payment on December 12, 1952 of $38,697.60 was a liquidating dividend to be treated as capital gains. But the balance of $150,000 was held to be ordinary income. In attacking this the Taxpayers urge that all of these distributions were in liquidation and should accordingly be so treated under 26 U.S.C.A. § 115(c). Alternatively, if not liquidating dividends, they were proceeds of a loan not taxable at all. The Government makes a dual rejoinder by insisting first, that the loans were not bona fide and second, that the Tax Court was entitled to find that these were in effect distribution of earnings to be taxable as ordinary dividends.

We think that in reaching the conclusion it did the Tax Court turned the tables on the principles which the Government's brief here quite amply puts forward and to which the Taxpayers generally subscribe. The Government's brief asserts that Taxpayers' contentions are clearly untenable because they "exalt form over substance and hence violate the well-established rule that the tax consequences of a transaction are not to be determined solely by the forms employed but depend upon the substance of the transaction. In other words, the form used by the parties cannot be utilized to obscure the realities involved."[5]

---

5. To this statement the Government in its brief cites "See Commissioner v. Court Holding Co., 324 U.S. 331, 334 [65 S.Ct. 707, 89 L.Ed. 981]; Helvering v. [F. & R.] Lazarus & Co., 308 U.S. 252, 255 [60 S.Ct. 209, 84 L.Ed. 226]; Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 266–267 [78 S.Ct. 691, 2

We think that there will be few records in which "the substance of the things hoped for" was established with such positiveness or in which, if defects exist, they are entirely from the form chosen, not the real acts done.

Only two defects have been spotted by the Government. One is that this was cast in the form of a loan with promissory notes and comparable accounting book entries. The other is that no formal plan of liquidation was adopted in June 1952 and consequently the decisions of that meeting may be considered only as a possible anticipated, but not assured, liquidation.

■ The first, of course, puts the Government in an awkward position. For it argues itself that the loans were not bona fide. It points to the absence of an intention to repay (or collect) and the nominal interest. We need not examine these two facets. Nor need we assay it in terms of whether it was bona fide. We think it crystal clear that the notes came into being solely as a step in the planned and determined liquidation. They offered to the Cuban lawyer a convenient legally effective mechanism by which to accomplish liquidation and at the same time meet the technicalities of Cuban law and protect all against over-distribution or unforeseen contingencies. It would, in the very words of the Government, "exalt form over substance" if this were decisive either alone or as a factor in the whole setting.

■ The second defect amounts to no more. At the outset the Government concedes that the presence or absence of formal corporate resolutions adopting a fixed plan of liquidation is not decisive. Indeed, it is not at all unusual for it to assert in its usual role of substance-over-form that such actions are mere trappings designed to conceal ordinary dividends. What really counts, as we and others have many times said, is whether in actual point of fact it is the intent of the corporation to wind up its affairs, gather in its resources, settle up its liabilities, cease taking on new business, and then distribute to its stockholders all that is left over. Beretta v. Commissioner, 5 Cir., 1944, 141 F.2d 452, 455, certiorari denied 323 U.S. 720, 65 S.Ct. 50, 89 L.Ed. 579; Kennemer v. Commissioner, 5 Cir., 1938, 96 F.2d 177; Canal-Commercial Trust & Savings Bank v. Commissioner, 5 Cir., 1933, 63 F.2d 619.

It takes both an intent to liquidate, that is wind up, and acts done to manifest and effectuate that purpose. "The determining element [is] the intention to liquidate the business, coupled with the actual distribution of the cash to the stockholders." Kennemer v. Commissioner, supra, 96 F.2d at page 178. And the inquiry, this Court has stated, is " * * * whether or not the distribution or dividend was made with the intent that the corporation would remain as a going concern or was it made with the affirmative intent to ultimately liquidate the company." Beretta v. Commissioner, supra, 141 F.2d at pages 454–455.

This standard was met by overwhelming evidence. In the internal empasse between the Cubans and Americans, it was positively recognized that to satisfy the demands of the Cubans for realization of profits without at the same time subjecting the Americans to high taxation on dividends as ordinary income, liquidation was the only way out. That end is permissible and legal and the obvious tax savings do not imperil it. The June 4 meeting adopted that course and save for the two formal defects rejected above it was plain that the corporation set out a plan to liquidate.

All of that program—save for the apparent but unreal defects previously discussed—and all done thereafter was consistent with the purpose to liquidate and at complete variance with any notion that the business was to go on. To suggest, as does the Tax Court, that the determination "to liquidate sometime in Sep-

L.Ed.2d 743]; Haley v. Commissioner, 203 F.2d 815, 818 (C.A.5th); Campbell v. Fasken, 267 F.2d 792, 795–796 (C.A.

5th); Factor v. Commissioner (C.A.9th [281 F.2d 100]), decided June 20, 1960 (60–2 U.S.T.C. par. 9551)."

tember * * * or * * * after September 30 * * * " makes this "amount to nothing more than a plan to carry on business as usual for the next few months and then liquidate" is to disregard entirely the realities of this record and the practical necessities of the business world. As Milliken aptly put it, "You don't terminate a steamship business like you shut off a water faucet." The corporation was the obligated under current contracts for transportation of cargoes both ways and under charters of vessels needed to perform them. It was obliged to fulfill such contracts and performance of legally enforceable duties is not inconsistent with a previously adopted purpose to liquidate or the step-by-step execution of it. Actually this target date turns out to have been remarkably prophetic since all business activities ceased by October 27—less than a month after the target date. Moreover there is not a single syllable of evidence to indicate that any business activity carried out subsequent to June 4 was new in the sense that the corporation took on the performance of contracts consummated after that date. To the contrary the record shows that during the period from June 4 to December 12 the additions to accumulated cash were relatively small. (See note 4.) And while it was freely acknowledged that vessels were under short term, rather than long term, charter this fact had no decisive importance since the uncontradicted evidence reflected that "short term" could run as long as four to five months.

■ It is the essence of the concept of substance prevailing over form that the transaction be viewed as the continuous whole which it really is. It is not to be truncated into isolated phases, whether the result is now to give advantage to the taxpayer, at other times to the Collector. United States v. M. O. J. Corp., 5 Cir., 1960, 274 F.2d 713; Georgia-Pacific Corp. v. United States, 5 Cir., 1959, 264

F.2d 161; Kimbell-Diamond Mill Co. v. Com'r, 14 T.C. 74, affirmed 5 Cir., 1951, 187 F.2d 718, certiorari denied 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626. When examined in this light, there was an imperative business need to liquidate, a corporate decision to undertake it, and an orderly, prompt, efficient execution of that program.[6] What was received in distribution was a liquidating dividend and as to such, it is for Congress to say, as it has, that they are to be treated as capital gains.

Reversed and remanded.

JONES, Circuit Judge (dissenting).

At the time the so-called loans were made a liquidation may have been contemplated but no plan of liquidation had been adopted and no commitment to liquidate had been made. The inferences drawn by the majority are not consistent with those of the Tax Court and I see no reason to reject its findings. I would affirm.

6. In this connection it is noteworthy that the Government concedes the last payment of $38,697.60 to be in liquidation, and yet there is no sufficient basis on which to distinguish this payment from the earlier ones either in point of time or manner of payment.