A. S. GENECOV and wife, Hilda Genecov, Appellants,

v.

UNITED STATES of America, Appellee.

No. 26139.

United States Court of Appeals Fifth Circuit.

June 11, 1969.

# 558

Henry Schwartz, II, Charles F. Potter, Spruiell, Lowry, Potter, Lasater & Guinn, Tyler, Tex., for appellant.

Richard B. Hardee, U. S. Atty., William Wayne Justice, U. S. Atty., Tyler, Tex., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Elmer J. Kelsey, Harry Marselli, Michael B. Arkin, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before COLEMAN and GODBOLD, Circuit Judges, and SCOTT, District Judge.

COLEMAN, Circuit Judge:

The Internal Revenue Service determined a deficiency in the income tax of the taxpayers, Mr. and Mrs. A. S. Genecov, of Tyler, Texas, in the amount of $4,499.80 for the calendar year 1963. The deficiency was paid and suit was filed to recover it. The primary issue was whether certain stock became worthless in 1963, entitling the taxpayers to a deduction for a capital loss. The case was tried to the District Court, without a jury. The Court held that the stock became worthless in earlier years and the taxpayers were thus not entitled to recover. We affirm.

The dispute centers upon the worth, or worthlessness, of certain Carlton Hotel Company securities owned by the taxpayers.

The Carlton Hotel Company was organized by a group of Tyler business-men in the 1950's. The Company had authorized capital stock of $800,000, represented by 8,000 shares of common stock with a par value of $100 each. One of those participating in the organization was the taxpayer, Mr. Genecov. In a period from 1953 to 1956, he purchased 156 shares of the Carlton stock for $15,550. He paid as much as $100 for some shares and as little as $50 for others.

From initiation, the hotel was never a financial success. In 1957, the Carlton Hotel Company began negotiating for the sale of the hotel to two Longview, Texas, businessmen, Earl Hollandsworth and Lee Travis.

The parties, Carlton Hotel Company (Carlton No. 1, old company) and Hotel Carlton, Inc. (Carlton No. 2, the new corporation formed by Hollandsworth and Travis), reached an agreement on February 28, 1957, pursuant to which Carlton No. 2 agreed to purchase the hotel building, the land on which the hotel stood, and all personal property in the building.

Payment was to be made in the following manner: (1) Carlton No. 2 was to pay $297,000 in cash within ten years, for the benefit of Carlton No. 1's cumulative debenture holders (the debentures were issued in 1956 in an attempt to meet losses which had been incurred). (2) Carlton No. 2 was to pay Carlton No. 1 one-half of its net annual profits (as shown on Federal Income Tax Returns) until $435,550 was paid. The greatest portion of this, or $391,600 was for the benefit of Carlton No. 1's stockholders, and the remainder was for the benefit of one of its creditors. (3) Carlton No. 2 was to pay $60,914.25 to cancel delinquent taxes on the hotel property, and $48,614.52 to two banks, who were creditors of Carlton No. 1. (4) Carlton No. 2 was to assume payment of the balance of Carlton No. 1's $800,000 promissory note. If Carlton No. 2 failed to pay within ten days after the installment became due or failed to pay any installment or principal within thirty

days from due date, or if the holder should mature the note, Carlton No. 2 was to return the property to Carlton No. 1, free of all encumbrances, except the balance due on the note.

The agreement further provided that if Carlton No. 2 wished to sell the property before paying the Carlton No. 1 debenture holders' and stockholders' obligations, Carlton No. 1 would first be given an opportunity to repurchase the property. In the event that Carlton No. 2 sold the property to another person, the proceeds received were to apply first to the debenture holders' obligation and one-half of the remainder to the stockholders' obligation.

Subsequent to this agreement and sale, Carlton No. 1 discovered that no provision had been made for the payment of the Texas Corporation Franchise Tax, and it had no funds with which to make the payment. Its stockholders met on July 17, 1958, to consider dissolving the corporation and transferring its assets to a trustee in order to avoid payment of the franchise taxes. That same day, Carlton No. 1 entered into a trust agreement with Peoples National Bank of Tyler, thereby transferring all property, accounts receivable, and other assets to the bank. In addition, it transferred all rights which it had under the agreement with Carlton No. 2 and all rights to collect the debenture holders' obligation.

The debenture holders and stockholders were the beneficiaries of the trust, and the trust was to continue until the trust estate was paid to the beneficiaries. The agreement gave no operating or managerial powers to the trustee. A written list of the stockholders of Carlton No. 1 was attached to the trust agreement, representing the beneficial ownership of the assets of the trust.

Following the sale to Carlton No. 2 in 1957, Carlton No. 1 carried on no business except to wind up its affairs. In June, 1958, it surrendered its charter and a certificate of dissolution was issued. It filed its final tax return in July, 1958, reporting no corporate activity and no corporate assets. Attached to the return was a form which was to be filed within thirty days of dissolution or liquidation including the certificate of dissolution.

During the ten years following the purchase of the hotel, Carlton No. 2 did not make a profit (in the federal tax return sense), and had not paid any money pursuant to the stockholders' obligation. Its net operating losses have averaged $65,000 per annum.

In 1961, Genecov purchased 250 shares of Carlton No. 1 for $12.50, or a nickel per share. Then, in 1963, he sold his entire interest in Carlton No. 1 for $100, or twenty-five cents per share.

Genecov brought this suit to recover a refund on income taxes paid in 1963. He alleged that the stock in Carlton No. 1 became worthless in that year, and consequently, he was entitled to deduct the difference between the amount he paid for the stock ($15,862.50) and its sale price ($100) as a *loss* in 1963.

The Court found that four identifiable events occurred in 1957 and 1958 which made the Carlton No. 1 stock worthless in those years:

(1) Carlton No. 1 sold all of its operating assets in 1957;

(2) Carlton No. 1 conveyed its remaining assets in trust in 1958;

(3) Carlton No. 1 was dissolved in 1958; and

(4) Carlton No. 1 filed its last income tax return and notification of intent to dissolve or liquidate in 1958.

The Court concluded (1) that Carlton No. 1's dissolution in 1957 and 1958 constituted a liquidation under § 331 of the Internal Revenue Code, and, following sale of the hotel, that Carlton No. 1 took no further steps inconsistent with liquidation; (2) that the assignment of the stockholders' obligation to the trustee constituted a distribution to the beneficial owners of the obligation; (3) that the taxpayers failed to establish that the stockholders' obligation had a fair market value at the time the hotel was sold or when the obligation was transferred to

the trustee, and therefore it had only a nominal fair market value; in any event it could not have exceeded 50% of the stockholders' original investment, since the obligation was for only $391,500 while the authorized capital was $800,000; (4) that the taxpayers' loss was complete in 1958; (5) that irrespective of Carlton No. 1's liquidation, the taxpayers' investment therein was worthless by 1958; and (6) that the taxpayers did not suffer a loss in 1963. Therefore, the Court held that the Genecovs were not entitled to a refund in 1963. The taxpayers appeal.

The finding that there were four identifiable events in 1957 and 1958 which evidenced the worthlessness of the stock in those years is attacked as clearly erroneous. The holding that there was a corporate liquidation in 1958 under § 331 of the Internal Revenue Code is challenged as erroneous. We do not agree with either contention.

## I

The statute in question provides:

"Section 165, I.R.C. (1954)

"(a) *General Rule*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \*

"(g) (1) *Worthless Securities*—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

"(2) *Security Defined*—For purposes of this subsection, the term 'security' means—

(A) A share of stock in a corporation."

■ To be allowable as a deduction, the loss must be evidenced by closed and complete transactions, which are fixed by "identifiable events", Treasury Regulation 1.1651–1(b). The question of whether a stock becomes worthless during a particular year is strictly a question of fact, and the fact finder is entitled to draw reasonable inferences and conclusions. This Court, in review, is limited to a consideration of whether the finding was in accordance with law, Boehm v. Commissioner of Internal Revenue, 326 U.S. 287, 293, 66 S.Ct. 120, 90 L.Ed. 78 (1945). See, also, Rule 52(a), F.R.Civ.P., findings of fact are not to be set aside unless "clearly erroneous".

■ The Court in *Boehm*, supra, made clear that a subjective test, limited to the taxpayer's own idea of "worthlessness", is not adequate:

"[A]nd a determination of whether a loss was in fact sustained in a particular year cannot fairly be made by confining the trier of facts to an examination of the taxpayer's beliefs and actions. Such an issue of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration regardless of their objective or subjective nature. As this Court said in Lucas v. American Code Co., 280 U.S. 445, 449, [50 S.Ct. 202, 203, 74 L.Ed. 538, 67 A.L.R. 1010] 'no definite legal test is provided by the statute for the determination of the year in which the loss is to be deducted. The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal test'."

*Id.* at 292–293, 66 S.Ct. at 123–124.

■ The burden of proof rests on the taxpayer to show "by some fixed and identifiable event or events, that the stock became worthless in the year for which the deduction is claimed", 875 Park Avenue Company v. Commissioner of Internal Revenue, 2 Cir., 1954, 217 F. 2d 699. This event is not fixed by selling for a nominal sum a stock which has become worthless in an earlier year, Keeney v. Commissioner of Internal Revenue, 2 Cir., 1940, 116 F.2d 401.

It has been held that a decision to terminate a business, Rassieur v. Commissioner of Internal Revenue, 8 Cir., 1942, 129 F.2d 820, or to dissolve or

liquidate when a corporation is insolvent, J. H. Cooper Enterprises v. Commissioner of Internal Revenue, 8 Cir., 1954, 215 F.2d 723, constitutes identifiable events evidencing the worthlessness of a stock. Another court has held that the mere fact of reorganization or receivership is not enough to fix the date of worthlessness, Mahler v. Commissioner of Internal Revenue, 2 Cir., 1941, 119 F.2d 869.

We have held that a stock has not become worthless until the "last vestige of value has disappeared", Miami Beach Bay Shore Company v. Commissioner of Internal Revenue, 5 Cir., 1943, 136 F.2d 408, 409; see, also, Bodzy v. Commissioner of Internal Revenue, 5 Cir., 1963, 321 F.2d 331. However, in Miami Beach Bay Shore Company, supra, 136 F.2d at 409, the Court held that a stockholders' meeting and adoption of a resolution for liquidation furnished an identifiable event which would indicate the stock's worthlessness.

In Ainsley v. Commissioner of Internal Revenue, 9 Cir., 1954, 332 F.2d 555, a corporation whose stock was involved had sustained losses for several years and made an unsuccessful attempt to sell its operating assets. The Court held that the fact that the corporation later sold the assets did not show the existence of a going concern or establish that the stock had value in the year in which the taxpayer wrote it off as worthless. To the Court, the question was:

> "[W]ould a prudent purchaser in an arms length transaction have regarded the stock in this enterprise as representing any equity at all in this debt-ridden inactive company with its history of several years of uninterrupted and ruinous operating losses?"

*Id.* at 557.

The determination of the District Court that Carlton No. 1 stock was worthless in 1957 and 1958 was supported by substantial evidence and was not clearly erroneous.

■ As all parties agree, Carlton No. 1 was in dire financial straits from its inception, and after the sale to Carlton No. 2, no profit was made for ten successive years. We agree that the sale of Carlton No. 1 operating assets in 1957, the placing of the remaining assets in trust in 1958, and the dissolution of 1958 could properly be considered as "identifiable events" evidencing the worthlessness of the stock in those years.

## II

Taxpayers contend that the Court below fell into error when it concluded that Carlton No. 1's sale of its operating assets in 1957 and transfer of its rights and obligations in 1958, followed by dissolution, constituted a § 331, I.R.C. liquidation.

If there is a complete liquidation, the amount of the corporate assets distributed to stockholders is treated as full payment in exchange for stock. Section 331, I.R.C. Thus the stockholder would be entitled to capital gain treatment in the year in which the liquidation took place.

■■ Like the question of "worthlessness", the question of whether a corporation has been liquidated is one of fact, Transportation Service Associates, Inc. v. Commissioner of Internal Revenue, 3 Cir., 1945, 149 F.2d 354; Kennemer v. Commissioner of Internal Revenue, 35 B.T.A. 415 (1937); aff'd., 5 Cir., 1938, 96 F.2d 177. The real factor, in determining whether a corporation has been completely liquidated,

> " * * * is whether in actual point of fact it is the intent of the corporation to wind up its affairs, gather in its resources, settle up its liabilities, cease taking on new business, and then distribute to its stockholders all that is left over. [Citations omitted].

> "It takes both an intent to liquidate, that is wind up, and acts done to manifest and effectuate that purpose. 'The determining element [is] the intention to liquidate the business, coupled with the actual distribution of the cash to the stockholders', Kennemer v. Commissioner of Internal

Revenue, supra, 96 F.2d at page 178. And the inquiry, this Court has stated, is '* * * whether or not the *distribution or dividend was made with the intent that the corporation would remain as a going concern or was it made with the affirmative intent to ultimately liquidate the company*', Beretta v. Commissioner of Internal Revenue, supra, 141 F.2d at pages 454– 455." Shore v. Commissioner of Internal Revenue, 5 Cir., 1961, 286 F.2d 742, 745.

■ The absence of a formal plan to liquidate is not conclusive, if those in control of the corporation entertain such an intention, Knox v. Commissioner of Internal Revenue, 5 Cir., 1963, 323 F.2d 84, 87. In addition, there may be a complete liquidation even if the business of the liquidated corporation is continued by the new corporation. Commissioner of Internal Revenue v. Berghash, 2 Cir., 1966, 361 F.2d 257.

Under the circumstances of this case, taking into consideration the fact that Carlton No. 1 sold its operating assets in 1957, transferred its remaining assets to the trustee in 1958, engaged in no further business except to wind up its affairs, and, finally, surrendered its charter and was dissolved, the Court below could reasonably conclude that there was definite intent to liquidate.

■ The difficulty, however, is whether, by the transfer of the "stockholders' and debenture holders' obligations" to the trustee, there was an actual distribution of assets to Carlton No. 1's stockholders in 1958. A liquidating transaction is taxed at the time the stockholder receives or is entitled to receive the proceeds of the liquidation, 2 Rabkin & Johnston, Federal Income Gift and Estate Taxation, § 23.- 01(3), p. 2305.

The Commissioner contends that the distribution was evidenced by the transfer of the stockholders' interest in Carlton No. 1 for a proportionate interest in the trust assets.

Two decisions tend to support the argument that there was no distribution in 1958. In one, Whitney Realty Company v. Commissioner of Internal Revenue, 6 Cir., 1935, 80 F.2d 429, cert. denied, 298 U.S. 668, 56 S.Ct. 834, 80 L.Ed. 1392 (1935), the stockholders of the corporation in question directed the corporation to transfer its assets to a trustee. The charter was then amended to terminate the company on December 26 of that year. Before that date, the assets were transferred to a trustee, who agreed to manage the property and distribute the balance of the proceeds to the stockholders. The Court held that, despite these activities, there was no corporate liquidation during that year:

"[I]t was the evident purpose of the stockholders to wind up the affairs of the company. They chose as an instrument * * * a liquidating agent for the company. The transfer to him by the company of its property for the purposes stated certainly was not a distribution to the stockholders in kind. They did not receive, and so far as appears from the record have not yet received, any of the assets of the company. The liquidating certificates are nothing more than evidence of their right to share in the residue of the proceeds of the sale of the assets after the payment of the corporate obligations and the costs of liquidation * * * In our opinion he was liquidating agent or trustee for the lumber company charged with the duty of winding up its affairs, discharging its obligations and distributing any balance of the proceeds from the sale of the property among the stockholders. There could have been no other purpose in conveying the property to him—indeed, it was necessary to satisfy the obligations of the corporation before there could be a distribution of assets among the stockholders, and until that was done and a distribution made, there could be no complete liquidation and no gain or loss realized by the petitioners."

*Id.* at 431.

In the second case, at the time the loss was claimed, on the basis that there had been a complete liquidation, no disposition had been made of certain intangible assets, such as good will and the trade name. The Court of Claims held that the taxpayer was not entitled to claim a loss for that year:

"[B]ut we are of opinion that when it appears, as here, that it is reasonably certain that the stockholders will receive a further liquidating dividend, a loss may not be allowed under the taxing act until there is a distribution of such dividend in property or money. Until this is done the stock has a value to its owner and the mere fact that because the corporation is in process of liquidation its value has declined in a particular taxable year to a figure which is less than cost does not entitle the stockholder to elect in which year he will take his loss."

Dresser v. United States, Court of Claims, 1932, 55 F.2d 499, 511.

The Commissioner argues, however, that when Carlton No. 1 was dissolved in 1958 the stockholders' obligation was not susceptible to distribution in kind, and thus the only practical means of distribution was to assign it to a trustee to hold for the benefit of the stockholders. To reenforce this argument, it is pointed out that Carlton No. 2 has never made payments toward any satisfaction of the stockholders' obligation.

We agree. Since the stock was "worthless", the taxpayers could not reasonably have expected to receive a distribution at some later date. Unlike the situation in *Whitney Realty*, supra, the trustee here had no powers except to hold the "obligations" for the benefit of the stockholders. And unlike *Dresser*, there was no "reasonable certainty" that the stockholders would receive any dividends at a future date. Because of the financial circumstances of Carlton No. 1, all that could be done to liquidate the corporation had been accomplished. Actually, as the Court below concluded, Carlton No. 1 since that time has engaged in no activity inconsistent with liquidation.

The Judgment of the District Court will be

Affirmed.