Thomas M. Hageman v. Commissioner.
Hageman v. Commissioner
Docket No. 1354-67.
United States Tax Court
T.C. Memo 1970-162; 1970 Tax Ct. Memo LEXIS 192; 29 T.C.M. (CCH) 715; T.C.M. (RIA) 70162; June 22, 1970, Filed Richard W. Roe, 2900 E. Oakland Pk., Fort Lauderdale, Fla., for the petitioner. W. Reeder Glass, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $48,450.85 in the taxpayer's income tax for the calendar year 1964 and a five percent addition to the tax under section 6653(a), I.R.C. 1954, in the amount of $2,422.54. The only issues remaining for decision are whether the taxpayer incurred a capital loss in 1964 resulting from the liquidation of Hageman Building and Development Company and whether he is liable for the addition to tax under *193 section 6653(a). Findings of Fact The parties have stipulated certain facts which, together with the attached exhibits, are incorporated herein by this reference. Thomas M. Hageman, a cash basis taxpayer, filed an individual income tax return for the taxable year 1964 with the district director of internal revenue, Jacksonville, Florida, and resided in Pompano Beach, Florida, when the petition was filed in this case. In 1951 the taxpayer caused to be constructed a 30-unit apartment complex in Fort Lauderdale, Florida, known as the "Merriweather Apartments". From 1951 716 to 1962, his principal business activity was operating and managing these apartments. On April 16, 1962, Hageman Building and Development Company ("HBDC") was incorporated under the laws of Florida, with its principal place of business in Fort Lauderdale. On April 18, 1962, the taxpayer was issued 1,000 shares of common stock of HBDC. From its inception until it was formally dissolved in 1965, he was the sole stockholder and president of HBDC. On May 2, 1962, HBDC purchased from Lenora Hortt a parcel of oceanfront property in Pompano Beach, Florida (the "Hortt property") for the sum of $251,217 on *194 which it gave a purchase money mortgage in the amount of $200,000. A residence was located on the Hortt property, and the taxpayer occupied it from the time of purchase until the property was sold in 1967. Two days later, on May 4, 1962, HBDC purchased from William and Gertrude Maus a parcel of land located in the City of Oakland Park, Broward County, Florida, for the sum of $130,000, on which it gave a purchase money mortgage of $96,000. On November 27, 1962, HBDC purchased from William O. Hundley, Sr., a tract of land contiguous to the Maus tract for the sum of $212,500, on which it gave a purchase money mortgage of $182,500. The two contiguous tracts will hereinafter be referred to collectively as the Rivermead property. HBDC acquired the Rivermead property with the intention of developing the property by constructing a condominium apartment complex there. One eight-unit apartment building was subsequently constructed and furnished and was used in part for an office and model apartments. A plat of the Rivermead property was recorded in the public records of Broward County, Florida, and HBDC conducted an advertising campaign in an effort to interest the public in the development. *195 However, the Rivermead venture proved financially unsuccessful. HBDC's income tax returns for the taxable years ending June 30, 1962, June 30, 1963, and June 30, 1964, and its so-called "final" return for the short taxable year ending December 31, 1964, reported the following operating losses: Year Ending
Loss Per Return
June 30, 1962
$11,797.09
June 30, 1963
82,285.67
June 30, 1964
40,312.55
Dec. 31, 1964
39,429.10
By March or April of 1964 HBDC was virtually inactive. On May 1, 1964, the taxpayer contracted to sell the Merriweather Apartments to John Edward and Olive M. Mullaney. The transaction was closed on May 15, 1964, and on his Federal income tax return for that year the taxpayer reported a long-term capital gain from the sale in the amount of $277,810.86, without taking into account depreciation allowable in the year of sale. [1]
At the time of the sale of the Merriweather Apartments, the taxpayer knew that he had realized a substantial capital gain from the *196 sale, and after consulting his attorneys and accountants, he decided to try either to sell his stock in HBDC or to cause HBDC to sell its assets and liquidate in 1964 in order to offset his gain from the Merriweather sale with the loss he expected to realize from a sale of his HBDC stock or through a liquidation of HBDC. Accordingly, in June and July of 1964, he advised several real estate brokers that HBDC or its assets were for sale. On November 2, 1964, the James T. Barnes & Company (the "Barnes Company"), acting as agent for Klingbeil & Haddox and Company of Columbus, Ohio ("Klingbeil") wrote to the taxpayer offering to purchase the Rivermead property for a gross purchase price of $490,000. The offer of purchase was subject to the following conditions: 1. All taxes and special assessments on the entire property and interest on the three mortgages to be pro-rated to the date of actual closing of the sale. 2. Arrangements for installation of sewer lines with Coral Heights Utilities, Inc. or the City of Oakland Park, [to] be worked out in a manner satisfactory to the purchaser. 3. Subject to engineering data as to required pilings, footings, and soil conditions satisfactory *197 to the purchaser. 4. Subject to seller releasing to buyer any engineering data on entire parcel and building plans on existing structure. 5. Subject to obtaining a variance in the zoning ordinance which will permit parking on the land zoned for duplexes along N.E. 16th Avenue. 6. Subject to evidence that zoning is permitted for the construction of fourstory elevator apartment buildings on all of the land except that part zoned for duplexes and commercial. 717 On November 4, 1964, the taxpayer, as president and sole stockholder of HBDC, wrote to Mr. Clarence MacKinnon of the Barnes Company and made the following counter-offer: Mr. Clarence MacKinnon Ft. Lauderdale, Florida
Dear Mr. MacKinnon: I will accept your Offer for Rivermead Subdivision, dated 11-2-64, on the following basis: 1. The gross purchase price of $490,000.00, less 100 feet of frontage. 2. A return of $2,000 to me that is now held in escrow in First Federal for covering the installations of septic tanks which you will not need. 3. A three way Broker split. 4. I have had plans in my mind for a long time for a small medical building. If I were to sell this property to you at your price, I *198 would be selling at the price of 40" on the $1.00. I would like 100 feet of frontage, free and clear, next to the Church or anywhere you choose to elect. This would give me a small chance to salvage some of these terrific losses. It is my opinion this 100 feet would mean very little to you. I will not guarantee to build this building but if it is built, it will be a boon to Rivermead and a definite asset to selling as it would be easy walking distance for each person living there. 5. I would prefer a closing date as of 12-31-64. This is a must - due to income tax reasons. 6. I will sign deeds in escrow prior to closing. * * * A contract for sale dated November 14, 1964, and accepted by HBDC on November 18, 1964, was entered into between HBDC as seller and the Barnes Company as agent for Klingbeil. The contract embodied substantially the terms which Klingbeil had offered on November 2, 1964. The "terms and conditions" of the contract read as follows: Terms and Conditions: Purchaser to assume the three outstanding mortgages referred to as the Hundley, Maus and First Federal mortgages which aggregates approximately $285,00.00 and pay the balance of the purchase price in cash. *199 It is understood that prior to the closing this contract is conditioned upon Purchaser making satisfactory arrangements in his discretion with Coral Heights Utilities, Inc. or the City of Oakland Park for the installation of sewer lines to adequately cover the above-described property. This contract is further subject to and contingent upon satisfactory engineering data in the opinion of the Purchaser as to required pilings, footings and other engineering data for the erection of any improvements on the premises that may be contemplated by the Purchaser. The Seller agrees to turn over to the Purchaser prior to the closing all engineering data that he presently has on the subject property. This contract is further subject to the Purchaser prior to closing obtaining a variance in the existing zoning which will permit parking on the land presently zoned for duplexes along North East 16th Avenue and further that existing zoning permits the construction of four story elevator apartment buildings on all of the above-described property except that portion presently zoned commercial and/or duplexes. The closing of this transaction will take place on or before ninety (90) days from the *200 date hereof, the Purchaser, however, will on the request of the Seller close this transaction and record the deeds prior to December 31, 1964 with the understanding that all expenses pertaining to the recording of these deeds will be borne by the Seller and quit claim deeds will be held in escrow to convey title back to the Seller if any provisions of this contract are not met within ninety days of the date hereof. * * * A special combined meeting of the stockholder (the taxpayer) and directors of HBDC was called and held on November 17, 1964, to approve the proposed sale of the Rivermead property and such other matters as might come before the meeting. The contract dated November 14, 1964, was approved by the stockholder and directors. In addition, the stockholder and directors adopted a resolution to liquidate HBDC "pursuant to Section 337 of the Internal Revenue Code of 1954". [2] One resolution provided as follows: RESOLVED that as quickly as feasible, but in any event not less than twelve (12) months from the date hereof, all cash and 718 remaining assets of the company shall be distributed to the stockholder in complete liquidation. *201 On or about December 18, 1964, and pursuant to section 6043, I.R.C. 1954, Elliot B. Barnett, counsel for HBDC, sent to the district director of internal revenue, Jacksonville, Florida, a completed Form 966, notifying him of the decision to liquidate HBDC pursuant to section 337. By letter dated December 23, 1964, HBDC notified the Barnes Company that it wished the sale of the Rivermead property to be closed prior to December 31, 1964. Klingbeil and the Barnes Company formed a corporation known as Rivermead, Inc., with each as a 50 percent stockholder, for the purpose of developing the Rivermead property. The certificate of incorporation was filed with the Secretary of State on December 30, 1964, and the contract with HBDC was assigned to to Rivermead, Inc. On December 31, 1964, HBDC, Rivermead, Inc., and Fidelity Title and Abstract Company ("Fidelity"), as escrow agent entered into an agreement entitled "Closing Agreement and Escrow". HBDC was referred to therein as "Hageman". Under the Closing Agreement, Fidelity acknowledged receipt of the following: A. A Warranty Deed from Hageman, as grantor, to Rivermead, as grantee (hereinafter called the "Warranty Deed"). B. A Special *202 Warranty Deed from Rivermead, as grantor, to Hageman, as grantee (hereinafter called the "Special Warranty Deed"). C. The sum of ONE HUNDRED EIGHTY THOUSAND ($180,000.00) DOLLARS in collectible funds from Rivermead (hereinafter called the "Proceeds of Closing"). D. An affidavit of "No Liens" on the subject property stating that the said property is encumbered solely by the mortgages assumed by Rivermead, which affidavit has been executed and acknowledged by Hageman as of this date (hereinafter called the "No Lien Affidavit"). Escrow Agent herein specifically acknowledges that it has previously received the sum of TWENTY FIVE THOUSAND ($25,000.00) DOLLARS, which said sum is being added to the sum of $180,000.00, above described, making a total sum to be held in escrow hereunder TWO HUNDRED FIVE THOUSAND ($205,000.00) DOLLARS, the aggregate of which is hereinafter called the "Proceeds of Closing". The total amount of $205,000 represented the difference between the gross purchase price of the Rivermead property and the approximate amount of outstanding mortgages. In the agreement Rivermead, Inc., acknowledged that all of the conditions of the contract of November 14 had been satisfied *203 with the exception of the provisions relating to the sewer system: A. Rivermead states that it is purchasing and acquiring this date the subject property and assuming the mortgages thereon, as of the effective date hereinafter set forth. Rivermead states that it has examined the abstract and finds that title is in accord with a Deposit Receipt Contract, dated November 14, 1964; that it has received satisfactory engineering data as called for in the Deposit Receipt Contract dated November 14, 1964; and, that all other conditions of the contract have been satisfied, with the exception of an Agreement relating to the installation of sewer lines and furnishing of a sewer system, the furnishing and execution of which said Agreement is the sole reason for this Escrow, * * *. The purpose of the escrow arrangement was set out in greater detail: IV. PURPOSE OF ESCROW. Hageman and Rivermead agree and acknowledge that from and after the date of execution of this Agreement, and the contemporaneous recordation of the Warranty Deed, Rivermead is the owner of the subject real property. Hageman acknowledges and understands, however, that Rivermead cannot make effective use of the subject property *204 until such time as a sewer agreement has been entered into which is satisfactory to Rivermead, and accordingly, Hageman agrees that it shall be the responsibility of Hageman to make all mortgage payments (including interest) and be responsible for all taxes up through and including the effective date hereinbelow provided for. Hageman and Rivermead covenant with each other that they will use their best efforts and will supply the assistance of their respective attorneys to the end that Rivermead shall be supplied with a satisfactory Agreement for the installation of sewer lines and sewer system to the subject property. In this connection, Rivermead and Hageman acknowledge that the said agreement shall be between Coral Heights Utilities, Inc., and Rivermead, and the City of Oakland Park and Rivermead; further, Rivermead acknowledges that it is satisfied as to the price and terms between itself and Coral Heights Utilities, Inc., but is not satisfied to execute a contract with the said Coral 719 Heights Utilities, Inc., until such time as the City indicates in a writing satisfactory to Rivermead that it will not oppose, but will cooperate with Coral Heights Utilities, Inc., in *205 and about furnishing service to Rivermead. In the alternative, Rivermead will be satisfied that it has adequate and satisfactory arrangements for sewer service if the City of Oakland Park enters into a binding agreement wherein and whereby it contracts to supply sewer service for price and terms agreeable to Rivermead. Upon the execution of an agreement with Coral Heights Utilities, Inc., and a document signed by the City of Oakland Park stating that it will not oppose, but will cooperate with Coral Heights Utilities, Inc., in and about furnishing service to Rivermead; or upon the execution of a contract for sewer service with the City of Oakland Park, Rivermead shall notify the Escrow Agent, in writing, to disburse the funds pursuant to the provisions of paragraph B of article III of this Agreement. In the alternative, Rivermead agrees that it will execute such a document of direction to the Escrow Agent in the event it executes an agreement with Coral Heights Utilities, Inc. and receives a letter or similar document from the City of Oakland Park to the effect and in substance providing that the City of Oakland Park agrees that if within four (4) months from date it cannot contract *206 to supply sewer service and facilities, that the said City will not oppose, but rather, will cooperate with Coral Heights Utilities, Inc. in providing such service to Rivermead. In the event by the date aforesaid, namely, February 15, 1965, Rivermead is not supplied with one of the sewer service agreements above described and, therefore, does not notify the Escrow Agent, the Escrow Agent shall advise Hageman who shall, in turn, have the right to direct the Escrow Agent to disburse pursuant to the provisions of paragraph C of article III or Hageman may, at his discretion, continue said escrow for an additional thirty (30) day period. In the event of the latter (or at the end of the thirty (30) day period) all the parties shall be discharged from any further obligations hereunder each to the other and the Escrow Agent shall disburse pursuant to the provisions of paragraph C of article III. The instructions to the escrow agent and the disbursement instructions referred to above were as follows: III. Instructions to Escrow Agent A. Hageman and Rivermead instruct the Escrow Agent to forthwith record the Warranty Deed. B. Hageman and Rivermead instruct the Escrow Agent that upon *207 the receipt of written notification, as provided for under article IV, the Escrow Agent shall do the following with the items received by the Escrow Agent, to-wit: 1. From the Proceeds of Closing the Escrow Agent shall disburse such sums as are necessary to pay the 1964 real property taxes on the subject property if the same are unpaid at the effective date; and 2. From the Proceeds of Closing the Escrow Agent shall deduct such amount as will equal the proration of interest which is to be credited to Rivermead as of the effective date, and pay the same to Rivermead, or at Rivermead's direction; and 3. From the Proceeds of Closing the Escrow Agent shall pay all abstract costs incurred by Hageman. 4. From the Proceeds of Closing the Escrow Agent shall disburse the sum of $25,000.00, collectively, to the brokers in this transaction, to-wit: JACK ZEMAN, STEVEN J. JARVIS, and M. W. HOLBROOK and 5. From the Proceeds of Closing the Escrow Agent shall disburse and pay over to the parties entitled to the same, such other amounts as may be the responsibility of Hageman, as is shown on the closing statement to be signed by Hageman; and 6. The balance of the Proceeds of Closing shall *208 be paid to Hageman, or, at his direction; and 7. The Escrow Agent shall deliver to Rivermead the Special Warranty Deed and No Lien Affidavit. C. If the Escrow Agent has not received the written notification, as referred to in paragraph B above, by 6:00 P.M. Eastern Standard Time on the 15th day of February, 1965, the Escrow Agent shall disburse the documents and monies receipted for, as follows: 1. The Escrow Agent shall forthwith record the Special Warranty Deed at the expense of Hageman. 2. The Escrow Agent shall refund the Proceeds of Closing to Rivermead. 3. The Escrow Agent shall return the No Lien Affidavit to Hageman. In accordance with the instructions, a warranty deed, describing the Rivermead property, from HBDC to Rivermead, Inc., and dated December 31, 1964, was recorded in the public records of Broward County on December 31, 1964. 720 As part of the Closing Agreement the parties acknowledged that Rivermead, Inc., had not had an opportunity to examine the title of the Rivermead property and that therefore it was given until January 6, 1965, to examine the title. On January 8, 1965, Joseph A. Hubert, one of the attorneys for Rivermead, Inc., wrote the *209 Barnes Company a letter advising them that marketable title to the Rivermead property was vested in HBDC. Pursuant to the terms of Klingbeil's offer of November 2, 1964, Fidelity received a check from the Barnes Company on November 3, in the amount of $25,000. The check was supposed to have been deposited by Fidelity in its escrow account at the First National Bank in Fort Lauderdale on November 19, 1964, immediately following HBDC's acceptance of Klingbeil's offer, but due to an administrative oversight on the part of Fidelity, the check was not deposited until January 5, 1965. In accordance with the Closing Agreement, the Barnes Company also gave Fidelity a check, dated December 31, 1964, in the amount of $180,000, and designated as the balance of the purchase price of the Rivermead property. Both checks were drawn on the First National Bank, Miami, Florida. Fidelity deposited the $180,000 check on December 31, 1964, with the First National Bank of Fort Lauderdale. On January 4, 1965, the Barnes Company deposited with its Miami bank $205,000 in checks drawn on Detroit, Michigan, banks, but because that deposit was not considered "immediate funds", the $180,000 check was returned *210 to Fidelity on January 5, 1965 by the First National Bank, Fort Lauderdale, marked "Not Sufficient Funds". It was redeposited on January 14, 1965. The parties have stipulated that the stated reason for the use of the "Closing Agreement and Escrow" was that "no sewer service agreement had been obtained by Coral Heights Utilities, Inc., a privately owned utility company, from the City of Oakland Park, and further, no agreement between Coral Heights Utilities, Inc. and Rivermead, Inc. to furnish sewer services was acceptable until the City of Oakland Park indicated in writing satisfactory to Rivermead, Inc. that it would not oppose but would cooperate with Coral Heights Utilities, Inc. in furnishing sewer services to Rivermead, Inc. or, in the alternative, would furnish the service directly to Rivermead, Inc. itself for prices and terms agreeable to Rivermead, Inc." During 1964 and 1965 Coral Heights Utilities, Inc. ("Coral Heights") operated under a franchise granted to it by the City of Oakland Park, Florida, to provide sewer services to areas within the city limits. But prior to February 11, 1965, Coral Heights did not provide the Rivermead area with sewer services. During December *211 of 1964 Klingbeil, through its attorney, Joseph A. Hubert, corresponded with the City of Oakland Park and Coral Heights concerning a sewer service agreement for Rivermead. Klingbeil received the following letter from the City of Oakland Park: December 3, 1964 Klingbeil-Haddox Company 1165 Chambers Road Columbus, Ohio
Dear Sirs: The City of Oakland Park is entirely agreeable to a proposal that your organization enter into a contract with Coral Heights Utilities, Inc. provided that: (1) The contract meets with the approval of the City. (2) The City has positive assurance that the Coral Heights Utilities treatment plant is either presently adequate to handle the increased collection or will be expanded to do so. Should efforts to conclude a satisfactory contract with Coral Heights Utilities fail, and contingent upon the approval of the Broward County Health Department, the City will grant you permission to construct and maintain a package sewer treatment plant to serve the immediate area. With the assurance that one or the other method of sewage collection will be available in the near future, the City is willing to approve building plans immediately and to grant the *212 necessary permits. Yours very truly, Charles E. Cartwright Administrative Aide CEC/dm However, during 1964 and 1965 the Oakland Park City Council received a number of complaints about the quality of services provided by Coral Heights and was generally dissatisfied with its performance under its franchise. Moreover, at this time the Broward County Health Department would not allow Rivermead, Inc., to provide sewer service to the Rivermead area. 721 In mid-December of 1964, Coral Heights sent Hubert a partial estimate of the cost of sewer service and on or about January 7, 1965, it sent him a proposed sewer service agreement. On February 11, the City of Oakland Park and Coral Heights entered into an agreement authorizing the utility company and Rivermead, Inc., to enter into a sewer service agreement. Such an agreement was apparently entered into on June 23, 1965. By an application dated January 11, 1965, Rivermead, Inc., applied for a hearing before the Board of Adjustment of the City of Oakland Park for a change in the zoning laws in order to locate parking facilities on part of the Rivermead property. The requested change was the one included as a condition of *213 the November 14 purchase contract with HBDC. After a public hearing, the Board approved the request on February 9, 1965. On February 15, 1965, HBDC and Rivermead entered into a final settlement, pursuant to the Closing Agreement. On that date Fidelity delivered to Rivermead, Inc., the special warranty deed referred to in the Closing Agreement, and the deed was then destroyed by Rivermead, Inc. Fidelity disbursed the $205,000 it held as escrow agent as follows: Payee
Purpose
Amount
Attorneys for HBDC
Attorney's fees
$ 5,000.00
Broward County Tax Collector
Real estate taxes 1964
3,405.98
City of Oakland Park
Real estate taxes 1964
822.31
William O. Hundley, Sr
To bring mortgage current
10,112.50
First Federal Savings and Loan Association
Payment due 2-8-65
866.00
First Federal Savings and Loan Association
Mortgage transfer fee
10.00
Brokers
Commission
25,000.00
Fidelity
Seller's i/2 of escrow fee
100.00
Fidelity
Buyer's i/2 of escrow fee
100.00
Fidelity
Recording fee for warranty deed 12-31-64
2.25
HBDC
Net proceeds of sale
159,335.05
Rivermead, Inc.
Refund escrow overpayment
245.91
$205,000.00
As of the end of 1964, *214 the fair market value of the Rivermead property was $490,000, and petitioner's net equity, after taking into consideration outstanding mortgages and expected costs of sales, was approximately $159,000. Pursuant to the disbursements listed above, Fidelity issued a check to HBDC dated February 15, 1965, in the amount of $159,335.05. The check was endorsed as follows: "Hageman Bldg. & Dev. Co., Thomas M. Hageman Deposit to acct. of Thomas M. Hageman & Hageman Bldg. Co. Ft. Lauderdale Nat'l Bank Thomas M. Hageman." Out of the $159,335.05, $151,835.05 was deposited in account in the taxpayer's name at the Fort Lauderdale National Bank on February 16, 1965, while the remaining $7,500 was deposited at the same bank and on the same date in an account under the name of "Hageman Building Company." Hageman Building Company ("HBC") was not a corporation or a genuine entity of any kind. The taxpayer established an account under the name of HBC in order to "keep the name of Hageman Building Company alive * * * [on the] remote chance I could get going again." The taxpayer opened the HBC account on February 16, 1965, and closed it on June 7, 1966. During this period approximately 96 checks were *215 written on the account. Of these the taxpayer wrote only 27. The remainder were written by Gladys Dickens (who subsequently married the taxpayer). Ten of the checks were issued to John McMahon, an employee of HBDC. The first six of the ten checks were of equal amounts ($72.65) and issued at bi-weekly intervals. [3] The seventh check was for twice the amount of the previous checks ($145.30) and was the only check written to McMahon over a four-week period in May of 1965. The last three checks payable to McMahon were issued on successive Fridays in the amounts of $62.27, $50.43, and $62.27. Ten of the 27 checks written by the taxpayer were written to Gladys Dickens. The second, third, and fourth checks were 722 written for the same amount ($76.14) and were each issued approximately two weeks apart. The fifth check was issued eight days after the fourth and was for one-half the amount of the three previous checks ($38.07). The next four checks were each written for $86.14 and were each issued approximately two weeks apart. *216 The next (and last) of the ten checks was issued one week later for the one-half of the amount of the four preceding checks ($43.07). With the exception of the initial deposit on February 16, 1965, all deposits in the HBC account were transfers from the taxpayer's personal account at the bank. HBDC maintained a checking account at the American National Bank and Trust Company of Fort Lauderdale. As of December 31, 1964, the account had a credit balance of $2,148.65. The following debits and credits to the account were made in 1965: Date
Item
Amount
Balance
1-2-65
Check to John A. McMahon, an employee of HBDC, for mainte- nance of the Rivermead prop- erty
$ 33.92
$ 2,114.73
1-9-65
Check to John A. McMahon, an employee of HBDC, for mainte- nance of the Rivermead prop- erty
41.05
2,073.68
1-11-65
Check to taxpayer
2,155.00
(81.32)
1-15-65
Unidentified
5.00
(86.32)
1-20-65
Debit memo
2.00
(88.32)
1-22-65
Deposit (taxpayer)
100.00
11.68
1-23-65
Check to John A. McMahon, an employee of HBDC, for mainte- nance of the Rivermead prop- erty
72.65
(60.97)
1-25-65
First Federal Savings and Loan Association mortgage payment on Rivermead property mortgage
2,849.68
(2,910.65)
1-27-65
Deposit (taxpayer)
3,200.00
289.35
1-27-65
Debit memo
2.00
287.35
1-29-65
Service charge
2.25
285.10
1-31-65
Internal Revenue Service, 4th qtr. withholding/FICA
174.02
111.08
2-6-65
Check to John A. McMahon, an em- ployee of HBDC, for maintenance of the Rivermead property
72.65
38.43
2-26-65
Service charge
.93
37.50
4-1-65
Check to taxpayer
37.50
0
*217 The last two debits attributable to checks issued to John A. McMahon were dated approximately four and two weeks prior to the date of the first of the six bi-weekly checks issued McMahon from the HBC account and were both equal to the amounts of those checks ($72.65). The taxpayer was married on August 19, 1948. On July 27, 1962, he and his wife, Pauline, were separated. Pauline filed a suit for alimony or separate maintenance later that year, but the suit was dismissed for lack of prosecution on April 29, 1964. On April 3, 1963, the taxpayer and his wife entered into a separation agreement. It provided for payment of alimony by the taxpayer and further provided in part: 6. The Wife considers the property settlement as set out in this Agreement a just and fair one to her and the Wife covenants and agrees to accept the same in full satisfaction of alimony for herself, and Wife does covenant and agree to release, discharge and quitclaim the Husband from any other claim or demand, and does accept this settlement in full satisfaction of all property claims against the Husband, including property now owned or hereafter acquired, except as 723 herein provided. It is distinctly *218 understood, however, that the Husband shall not have the right to sell, mortgage, convey, lien or assign the properties known as the Merriweather Apartments, without the written consent and joinder of the Wife. Wife specifically covenants and agrees to join with Husband in the conveyance of any other properties now owned or hereafter acquired by Husband as may be necessary to effectuate passage of good title, as Husband may request from time to time. 7. The parties hereto agree that each will execute and deliver any and all necessary or proper instrument to carry out the purposes and intent of this agreement. In the event a decree of absolute divorce or separate maintenance is hereafter obtained by either party against the other, the parties hereto will each ratify this Agreement in writing upon request, and shall reciprocally make and give such quitclaims, deeds, or other instruments from time to time as may be necessary or desirable to carry out and effectuate the provisions of this Agreement. The separation agreement was modified by a subsequent agreement dated May 12, 1964, whereby Pauline agreed to join in the sale of the Merriweather Apartments and made the following waiver *219 of her dower and alimony rights: [The] wife does hereby release, exonerate and fully discharge the husband of and from any and all other or further obligations to her for support money, alimony or otherwise and does hereby waive and relinquish to the husband all of her dower or other rights that she may have or hold upon or against any of his property, real, personal or mixed and wheresoever situate, and does hereby release, exonerate and discharge the husband of and from any claim whatsoever except as herein contemplated. This is in lieu of alimony and dower rights. The wife does hereby agree to join with the husband, without additional charge, in the execution and delivery of any and all other deeds, bills of sale or other instruments which to him may seem or be necessary or proper in the sale, management or use thereof as he may be advised. On March 23, 1965 the taxpayer filed a suit for divorce against Pauline in the Circuit Court of Broward County, Florida. Pauline filed an answer and a counterclaim for divorce on May 14, 1965, and was granted a divorce on June 3, 1965. Elliot B. Barnett ("Barnett") represented the taxpayer and HBDC in negotiations culminating in the sale *220 of the Rivermead property to Rivermead, Inc., and he knew that Pauline had waived her right to a dower interest in her husband's property and that she had agreed to execute any instrument necessary to convey his property. However, at the end of 1964, he advised the taxpayer not to transfer record title to either the Rivermead or the Hortt properties from HBDC to himself at that time. It was his opinion that since Pauline's purported general release of dower was not of record, an attorney representing a prospective purchaser of real property from the taxpayer would insist upon an instrument from Pauline relating specifically to the property in question. Moreover, although neither Barnett nor the taxpayer discussed this problem with Joseph A. Hubert, who represented Rivermead, Inc., during these negotiations, Hubert would not have accepted a deed for the Rivermead property from the taxpayer unless Pauline had also executed the deed. And although Pauline had contractually agreed that she would execute any such deed, there was some apprehension that she might not do so if requested. During 1964 and 1965 neither the taxpayer nor Barnett talked to Pauline about her rights in HBDC's properties *221 or asked her to execute deeds to them. An additional reason for Barnett's advice not to transfer title to the Hortt and Rivermead properties at the end of 1964 was his opinion that in view of the taxpayer's illness (which is described below), there was a likelihood of "some problems" in the event of his death while he held legal title to the properties. After the settlement with Rivermead, Inc., on February 15, 1965, the taxpayer and Barnett discussed the problem of getting record title to the Hortt property out of the name of HBDC, while not placing record title in the taxpayer's name - because of the problems connected with Pauline's dower rights. In March of 1965, they considered having HBDC deed the Hortt property to Barnett as trustee, but this plan was abandoned. Subsequently, the taxpayer attempted to set up a trust with the American National Bank and Trust Company of Fort Lauderdale, whereby the bank would hold title to the Hortt property as trustee, with the taxpayer as beneficiary. In connection with this plan, the taxpayer sent the following letter to the bank in April of 1965: 724 April 13, 1965 American National Bank & Trust Company 1415 East Sunrise Boulevard *222 Fort Lauderdale, Florida Attention: Mr. Ed Mikol Re: Trust - Thomas M. Hageman Gentlemen: I herewith deliver to you a Warranty Deed from Hageman Building and Development Company to American National Bank and Trust Company as Trustee. Because I, as sole stockholder, am now dissolving Hageman Building and Development Company, it is necessary that the title to the following described property be conveyed out of the corporation. It will be more convenient for me and will avoid certain tax consequences to have title taken in your name as Trustee. Therefore, you are instructed to hold legal title to the property which is hereinafter described, in trust, subject to the directions and instructions contained in a trust agreement which is attached to this letter. It is my understanding that the fee schedule for your services as trustee is an opening charge of 1/10th of 1% of the appraised value of the property, and thereafter, an annual charge of 1/20th of 1% of the appraised value of the property. I do herewith advise you that the appraised value of the property is $100,000. Please execute the Trust Agreement and return the original to my attorney, Elliott B. Barnett, 707 North *223 Federal Highway, Fort Lauderdale, send one copy to me at my home at 750 North Ocean Boulevard, Pompano Beach and retain one copy for your own records as Trustee. Very truly yours, /s/ Thomas M. Hageman Thomas M. Hageman This proposal was also abandoned. The problem was resolved by entry of the Hagemans' final divorce decree on June 3, 1965, whereupon the property was conveyed from the corporation to the taxpayer on June 4, 1965, and the corporation was finally dissolved on June 14, 1965. Form 1099L, "Distributions in Liquidation During Calendar Year 1964", was filed by HBDC with its corporate income tax return for the short year ending December 31, 1964, and it showed liquidating distributions from HBDC to the taxpayer as follows: Item
Fair MarketValue
Cash
$161,599.71
Le ss: Accrued expenses
1,686.44 $159,913.27
Furniture and fixtures
12,000.00
Automobile
2,500.00
Building
$49,000.00
Land
201,000.00 $250,000.00
Less: Mortgage assumed
160,000.00 90,000.00
Deposits
0
Net distributions
$264,413.27
The "accrued expenses" figure of $1,686.44 was the sum of the following items:
Accrued accounting
$1,500.00
FICA taxes payable
93.36
Withholding tax payable
93.08
$1,686.44
*224 The furniture and fixtures listed on the Form 1099L were acquired by HBDC in 1963 and 1964 at a total cost of $13,737.82. The book value of the furniture and fixtures, as reported on HBDC's income tax return for the short year ended December 31, 1964, was $12,336.05 as of June 30, 1964. On December 31, 1964, the fair market value of the furniture and fixtures was no greater than $12,000. The taxpayer has claimed no depreciation on the furniture and fixtures distributed to him. However, he has sold approximately one-half of the furniture and reported no gain or loss on the sales. The automobile listed on the Form 1099L was purchased by HBDC in March, 1962, for $2,718.80. On its income tax return for the short year ended December 31, 1964, HBDC reported that the book value of the 725 automobile was $815.64 as of June 30, 1964. On December 31, 1964, the fair market value of the automobile was no greater than $2,500. The taxpayer has claimed no depreciation on the automobile distributed to him. On its books HBDC allocated the $251,217 purchase price of the Hortt property between the residence located thereon ($50,000) and the land ($201,217). From the date of purchase to December 31, 1964, HBDC *225 claimed depreciation of $2,708.33, leaving a book value for the Hortt property of $248,508.67 as of December 31, 1964. This figure was rounded off to $250,000 and allocated between residence and land on Form 1099L, as indicated above. By warranty deed dated June 4, 1965, and recorded June 21, 1965, HBDC conveyed the Hortt property to the taxpayer. HBDC did not obtain an appraisal of the Hortt property during 1964, or at the time the Form 1099L was prepared, or at the time when title was conveyed to the taxpayer. On August 28, 1967, the taxpayer and Gladys D. Hageman, whom he had married after his divorce from Pauline, sold the Hortt property for $275,000. That figure included a brokerage commission of $17,000 and closing costs of approximately $1,200. The closing statement also disclosed three liens held by a plumbing and heating firm, a construction company, and a lumber company in the total amount of $11,065. However, the lienors' labor and/or material increased the value of the Hortt property by no more than $700 over its value as of the end of 1964. The fair market value of the Hortt property on December 31, 1964, was between $250,00 and $258,000. On his individual income *226 tax return for the calendar year 1964, the taxpayer reported $264,413.27 as the "gross sales price" of 1,000 shares of HBDC stock and $436,048.04 as his basis for that stock, producing a long term capital loss of $171,634.77. In October of 1964 the taxpayer traveled to Mexico City where he contracted a lung ailment requiring hospitalization there. Later that month he was admitted to Jackson Memorial Hospital in Miami. The taxpayer's illness was considered serious, but the physicians in the Miami hospital were unable to identify the nature of his ailment. On November 14, 1964, against the advice of his attending physicians, the taxpayer checked himself out of the hospital. Two of his employees took him home, where he was confined to his bed and a wheel chair until late January, 1965. On January 30, 1965, the taxpayer was admitted to the Southeast [4]Florida Tuberculosis Hospital in Lantana, Florida, and was discharged on May 5 of that year. [5] While there, he signed his individual income tax return for the taxable year 1964 which had been prepared by the accounting firm of Stockwell, Eaton, Peed and Schott. As a result of his illness, the taxpayer was unable to examine his return *227 with care, and he relied on the work of the Stockwell firm, which had been preparing his returns for 10 or 12 years. On his return, the taxpayer claimed deductions for personal property and real estate taxes imposed on the Hortt property for the year 1964 (when record title title to the property was still in the name of HBDC), but which he did not pay until the following dates: Date Paid
Payee
Nature of Tax
Amount
2- 1-65
Broward County
Personal property taxes
29.21
2-17-65
City of Pompano Beach
Real estate taxes
1,243.65
2-17-65
Broward County
Real estate taxes
2,786.82
2-18-65
City of Pompano Beach
Special assessment (beach erosion)
6,040.56
$10,100.24
*228 In his statutory notice of deficiency, the Commissioner determined that the taxpayer did not sustain the claimed capital loss on liquidation of HBDC in 1964. The Commissioner also disallowed the deductions claimed by the taxpayer for property taxes which he did not pay until 1965, and in connection with that disallowance determined 726 that the taxpayer was consequently liable for the addition to tax for negligence under section 6653(a). Opinion RAUM, Judge: We consider first the question whether the taxpayer sustained a capital loss in 1964 as a result of the liquidation of HBDC. The dispute between the taxpayer and the Commissioner is exclusively over whether 1964 is the proper year for recognition of the loss. The taxpayer contends that since the claimed loss was reasonably certain in fact and in amount as of December 31, 1964, a deduction for the loss is allowable in that calendar year. The Commissioner takes the position that HBDC did not distribute its assets to the taxpayer, either constructively or otherwise, during 1964, that HBDC remained a viable, taxable entity in 1965, that therefore the claimed loss on liquidation of HBDC was not reasonably certain as of the *229 end of 1964, and that consequently the loss may not be recognized in that year. In the alternative, the Commissioner contends that the taxpayer is not entitled to a deduction for the loss in 1964 on the ground that he has not established the fair market value of the assets distributed to him in liquidation of HBDC. Since we sustain the Commissioner's first contention, we find it unnecessary to consider his second argument. In general, losses are recognized only when they have been realized. "Exception is made, however, in the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances, before they are absolutely realized." Lucas v. American Code Co., 280 U.S. 445, 449. The question of the proper time for recognition of a loss is particularly difficult where the event responsible for the claimed loss is a corporate liquidation which is carried out over two or more taxable years. See Dresser v. United States, 55 F. 2d 499, 511-512 (Ct. Cl.) certiorari denied, 287 U.S. 635; Shore v. Commissioner, 286 F. 2d 742, 745-746 (C.A. 5). The question is one of fact, *230 Genecov v. United States, 412 F. 2d 556, 561 (C.A. 5); Transportation Service Associates, Inc. v. Commissioner, 149 F. 2d 354, 355 (C.A. 3); Kennemer v. Commissioner 35 B.T.A. 415, 421, affirmed, 96 F. 2d 177 (C.A. 5), and the test is "practical" rather than "legal." Commissioner v. Winthrop, 98 F. 2d 74, 75 (C.A. 2), affirming 36 B.T.A. 314, acq. 1940-1 C.B. 5; Charles A. Dana, 6 T.C. 177, 182-183, acq. 1946-1 C.B. 2. See also Lucas v. American Code Co., 280 U.S. 445, 449. The record as a whole convinces us that as a practical matter the taxpayer did not realize a loss on his HBDC stock in 1964. By the spring of 1964 - before the taxpayer had decided to attempt to sell his HBDC stock or liquidate the corporation - HBDC was virtually inactive, and aside from the sale or distribution of the Hortt and Rivermead properties, very little was required to liquidate the corporation. But by the end of 1964, the great bulk of its assets, if not all of them, remained undistributed. HBDC continued to hold record title to its two most valuable assets, the Rivermead *231 and Hortt properties, and it was far from clear when their sale or distribution would be completed. To be sure, as of December 31, 1964, the Rivermead property was covered by a sales agreement. But that agreement was subject to a condition that sewer service be arranged for the Rivermead property. The uncertainty over sewer service was apparently serious enough to prevent the sale from being completed and to cause Rivermead, Inc., to require an escrow arrangement, with the seller remaining liable for property taxes and mortgage interest applicable to the period up to the day of final closing in 1965. The taxpayer has argued that even if the sale to Rivermead, Inc., had not been consummated, a sale to another purchaser would have been arranged. However, regardless of how firm it may have been, the taxpayer's intention to sell the Rivermead property at some time within the next year simply does not suffice to make 1964 the proper year for recognition of his loss on the liquidation of HBDC. Dresser v. United States, supra, 55 F. 2d at 511-512; Genecov v. United States, supra, 412 F. 2d at 561-563; cf. Gensinger v. Commissioner, 208 F. 2d 576, 581-583 *232 (C.A. 9). Moreover, it is far from clear to us on this record that had the sale fallen through there would have been a distribution of the Rivermead property in kind to the taxpayer in the event that another sale could not have been arranged. We consider the taxpayer's decision to keep record title to the Hortt and Rivermead properties in the name of HBDC 727 after the end of 1964 to be particularly significant. The taxpayer deliberately kept HBDC in existence and kept title to the two properties in its name as long as Pauline's dower rights threatened to interfere with the marketability of title to the tracts. Thus the period of time between his decision to liquidate HBDC in early 1964 and its formal liquidation in June of 1965 was not simply the result of the mechanics of closing out an on-going enterprise. It was the product of the taxpayer's decision to make use of HBDC during 1965 to defeat the problems created by Pauline's dower rights. Moreover, as of the end of 1964, it was altogether unclear when, if ever, the taxpayer and his wife would be divorced and the dower problem thereby eliminated. To be sure, the taxpayer did make at least two attempts to transfer title to *233 the Hortt property out of the name of HBDC before he and his wife were divorced, but each effort was abandoned, and the taxpayer has not explained his failure to complete them. The taxpayer urges that since he was already using the Hortt property as his residence in 1964, it was unnecessary to transfer title to the property in order to distribute it to him. We disagree. Both an intention to liquidate and an actual distribution of corporate assets are required to effect a liquidation for tax purposes. See Genecov v. United States, supra, 412 F. 2d at 561-563, and cases cited therein. Here, as of the end of 1964, the taxpayer's intent was clearly not to distribute the Hortt property at once, but to defer distribution indefinitely, until the problems created by his wife's dower rights could be overcome. Given his state of mind, we cannot conclude that the taxpayer's failure to transfer title may be overlooked. Rather we consider keeping title in the name of HBDC to be part of the taxpayer's plan to make use of the corporation for an indefinite period after the end of 1964. As of the end of 1964, HBDC had not distributed its two major assets, and it was unclear when those *234 assets would be distributed. We conclude that the taxpayer may not recognize his loss on the anticipated liquidation in 1964 since, as of the end of that year, substantial distributions had yet to be made and the time when those distributions would be made remained indefinite. Compare Dresser v. United States, supra, 55 F. 2d 499, with Commissioner v. Winthrop, supra, 98 F. 2d 74, and Charles A. Dana, supra, 6 T.C. 177. Next we consider the Commissioner's determination that the taxpayer is liable for an addition to tax under section 6653(a)[6] as a result of deductions claimed on his 1964 return for property taxes which were not paid until 1965. [7]Section 6653(a) provides that an addition to tax shall be imposed if any part of an underpayment of taxes is due to negligence or intentional disregard of rules and regulations. The taxpayer was quite ill at the time his 1964 return was filed, and he relied upon the work of accountants who had prepared his returns for the past 10 or 12 years. We are satisfied that the underpayments in question were not due to the taxpayer's negligence or intentional disregard of rules and regulations. Cf. Leo A. Woodbury 49 T.C. 180, 199-200, *235 acq. I.R.B. 1969-43, 46. We therefore hold that the Commissioner erred in determining the addition to tax under section 6653(a). Decision will be entered under Rule 50. Footnotes
1. The parties have stipulated that the taxpayer did not claim depreciation on the Merriweather Apartments on his 1964 income tax return and that he is entitled to such depreciation.↩
2. After the trial herein the parties filed a "Third Supplemental Stipulation of Facts" in which it was stipulated that if the petitioner had been asked on direct examination whether he had surrendered his stock certificate in HBDC for cancellation, his answer would have been "Yes, I surrendered it for cancellation on November 17, 1964." However, the certificate itself had been introduced in evidence at the trial and shows no physical evidence of cancellation.↩
3. Two checks, each also in the amount of $72.65, were issued to McMahon by HBDC in January and February of 1965 for maintenance of the Rivermead property.↩
4. Although the parties have stipulated "Southwest", it seems clear that this was a typographical error in view of a stipulated exhibit and other materials in the record. ↩
5. The taxpayer was readmitted to the hospital on July 19, 1966, and was discharged on September 17 of that year. On April 4, 1967, he was adjudged incompetent and a guardian was appointed for him by order of the County Judge's Court of Broward County. The same court declared his competency restored on August 4, 1967.↩
6. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. ↩
7. The Commissioner rests his determination upon the fact that Hageman was a cash basis taxpayer and apparently also on the fact that title to the Hortt property was in the name of HBDC at both the time the taxes were imposed and when they were paid.↩