The AINSLEY CORPORATION, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18964.

United States Court of Appeals Ninth Circuit.

May 27, 1964.

L. W. Wrixon, San Francisco, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harold C. Wilkenfeld, Edward L. Rogers, John Nolan, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before CHAMBERS, Circuit Judge, MADDEN, Judge of the Court of Claims, and MERRILL, Circuit Judge.

MADDEN, Judge.

The taxpayer, The Ainsley Corporation, has filed this petition for review of a decision of the Tax Court of the United States. This court has jurisdiction under Section 7482 of the Revenue Code of 1954.

The taxpayer in its federal income tax return for 1958 took a deduction from income of $102,770, because, it said, the shares of stock of Santa Clara Frosted Foods Company, hereinafter called Santa Clara, owned by the taxpayer, and having a basis to the taxpayer of $102,770, had become worthless in 1958. This deduction from its income reduced the taxpayer's tax by some $25,000. The Commissioner of Internal Revenue disallowed the deduction, served the necessary notice of deficiency, and the taxpayer filed a petition with the Tax Court for a redetermination of the deficiency. The Tax Court's decision was adverse to the taxpayer, and this petition for review of the Tax Court's decision was filed.

Section 165 of the Internal Revenue Code of 1954 provides, among other things, the following:

"SEC. 165.   Losses

"(a) *General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*       \*       \*       \*       \*       \*

"(g) *Worthless Securities.*—

"(1) *General rule.*—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for the purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

"(2) *Security defined.*—For purposes of this subsection, the term 'security' means—

"(A) a share of stock in a corporation;   \*   \*   \*   "

Santa Clara, whose stock, owned by the plaintiff, is the stock the worthlessness *vel non* of which is here in question, was a California corporation engaged in the processing of foods and vegetables such as lima beans, broccoli, spinach, brussels sprouts and peas. It purchased its vegetables from growers, harvesting some of them itself, in the fields and, purchasing some of them after they had been harvested by the growers. It packaged these vegetables and then turned them over to a storage company to be frozen and held in storage until it, Santa Clara, sold them to chain stores and other outlets which would sell them, directly or indirectly to consumers as frozen foods.

Santa Clara was incorporated in 1940. Its outstanding 2300 shares of stock were owner by the taxpayer, The Ainsley Corporation, which owned 925 shares, and William N. Lloyd, the president of Ainsley, who owner 1375 shares. Santa Clara was operated at a profit up to and including its fiscal year ending June 30, 1955. In the following fiscal years Santa Clara sustained operating losses, $16,113 in 1956, $231,656 in 1957, $244,448 in 1958, the losses in those three years aggregating $492,217. As of December 31, 1958, Santa Clara's liabilities exceeded its assets by $210,310.56 on a book value basis and $206,010.67 on a fair market value basis.

Approximately in March, 1958, Santa Clara began the following course of conduct: it made no more contracts with growers for the purchase of vegetables, although such contracts had to be made five or six months before crops matured in order to obtain vegetables for processing; it gradually laid off its employees, as their particular work was completed, the last employee being laid off in October or November, 1958; in March 1958 it caused the electric power to its only plant to be shut off, and thereafter obtained what little power it used by a makeshift arrangement with a neighboring enterprise; it disposed of all of its

processed food in 1958, in some instances purchasing some kinds of processed food from other processors in order to be able to fill orders and thus be able to dispose of its own remaining stocks of the kinds of food which it still had on hand; the equipment in the plant was greased to prevent rusting, and the plant was padlocked; constant and diligent efforts were made during 1958 to sell the business, all possible purchasers known to the Santa Clara management having been solicited with brochures or personal contacts or both, but there being no prospect, at the end of 1958 of a profitable sale of the business.

Our question is whether the taxpayer's stock in Santa Clara became worthless in 1958. Would a prudent purchaser in an arms length transaction have regarded the stock in this enterprise as representing any equity at all in this debt-ridden inactive company with its history of several years of uninterrupted and ruinous operating losses? With deference, we are obliged to say that we cannot see even the possibility that that might have happened. The Tax Court has held that the stock had value, and we will consider its reasons for reaching that conclusion.

The Tax Court found that the assets of Santa Clara on December 31, 1964 had a fair market value of $184,233.20. It reasoned that if the Santa Clara enterprise, with its plant, history, geographical location, past relations with growers of vegetables and purchasers of frozen foods, had a value of more than $184,-233.20, the fair market value of its physical assets, that would be proof that the stock in the corporation had not become totally worthless. The Tax Court said:

"In the instant case, as of December 31, 1958, there existed a going concern value to Santa Clara as a corporation in excess of the value of its assets. The evidence does not show this going concern value to be attached to anything other than the Santa Clara stock."

The taxpayer vigorously objects to the Tax Court's conclusion that Santa Clara, in the plight that it was in on December 31, 1958 had a going concern value. And government counsel in their brief and oral argument defending the Tax Court's decision, have omitted any mention of going concern value. Yet we suppose the quoted expression of the Tax Court is correct. At any rate, we do not have at hand any other expression to describe a situation in which an arms length purchaser would pay more for a lot of physical objects plus the history and other intangibles mentioned above, connected with those physical objects, than the fair market value of the physical objects alone. We suppose that such a purchaser must think that it would be easier, and more readily profitable, to resume former activities at the old stand than to start an entirely new enterprise without the related intangibles.

We do not understand, however, the Tax Court's apparent reasoning that if the situation discussed above existed, the stock might not, nevertheless, be worthless. No matter what the fair market value of the physical assets plus the value of the related intangibles might be, no purchaser would neglect to look at the other side of the balance sheet to see what the corporation's liabilities were. In the instant case the balance sheet, as of December 31, 1958, showed a liability of $350,000 which was a lien on the plant and machinery of Santa Clara, plus unsecured liabilities of $40,243.87. Thus Santa Clara, as a corporation, with whatever potential it may have had for resuming operations, had an excess of liabilities over assets of $206,010.67. A purchaser would have had to be willing to assume this liability before he would give any thought to how much, if anything, he would give for the stock in Santa Clara. Santa Clara was a small enterprise. In its last year of profitable operation, the fiscal year ending June 30, 1955, it paid its stockholders a total sum of $2300 in dividends. We have, earlier in this opinion, recited the ruinous operating losses which it sustained in the following years. Thus, the opportunity

to step into the shoes of Santa Clara was not an inviting one.

The Tax Court says that the fact that the officers of Santa Clara, in December of 1958, offered to sell its assets to Seabrook Farms Co. for $350,000, when the fair market value of its tangible assets was $184,233.20 is evidence that "some value other than liquidating value existed for Santa Clara as a going concern." In an eminent domain case in which the owner has, at a time not too remote from the taking, offered to sell the property in question for less than the amount which he is claiming, the offer is evidence of value which is admissible against his claim. But in the instant situation, in which the thing offered for sale had been of no interest whatever to the numerous potential buyers who had been approached, the price at which the Santa Clara officers offered the property to Seabrook could not have represented even a real hope of what they might get, or anything more than a figure at which the haggling over the price might begin. That it did not represent their estimate of what they could get for the property was proved by the fact that in 1959 they sold Santa Clara to Seabrook for a price which was nowhere near the $350,000 figure of their offer. It should be remembered that even if Seabrook had accepted the $350,000 offer, that would not even have paid Santa Clara's debts, and would of course have left nothing for distribution to its stockholders.

The government points out that in the sale of Santa Clara to Seabrook in 1959, Seabrook left 925 of the 23,000 shares of Santa Clara in the taxpayer's ownership, taking an option to buy these shares from the taxpayer for $10,000, which option it exercised in 1960. The government says that these events soon after 1958, the year in which the taxpayer says the shares became worthless, prove that the shares had in 1958 a substantial value, though greatly reduced from the basis of $102,770 which they had in the taxpayer's hands. If, in 1958, the taxpayer had had an offer of $10,000 for its Santa Clara stock, and had not sold it, it could not have claimed a worthless stock deduction nor a capital loss deduction on that account. And a sale of the stock, or the giving of an option to sell it, in 1959, for a substantial sum might, in many circumstances, be evidence that it was not worthless in 1958. But the taxpayer says, and we agree, that in the circumstances of the Seabrook transaction, the 1959 option and the 1960 sale prove nothing about the worth or worthlessness of the stock in 1958.

When the details of Seabrook purchase of Santa Clara were completed in October, 1959 they contained these items:

(1) The taxpayer had forgiven accrued interest owed to it by Santa Clara in the amount of $45,986.54.

(2) The taxpayer had a new note from Santa Clara to it in the face amount of $255,000, and had surrendered old notes of Santa Clara to it having an unpaid balance of principal of $283,763.09. The amount of the reduction of principal was $28,763.09.

(3) The taxpayer had 925 of the 23,000 new shares in Santa Clara, four per cent of the total number of shares, instead of 925 of the 2300 old shares, 40 per cent of the total number. The taxpayer's 925 shares represented no equity in Santa Clara, since they were under option to Seabrook for a fixed price. If the Seabrook operation of Santa Clara looked promising, as it apparently did in 1960, Seabrook would, as it did, exercise its option and the taxpayer would not share in Santa Clara's promising future, even to the extent of a four per cent interest.

(4) The new note of Santa Clara to the taxpayer for $255,000 was unsecured and was payable to the taxpayer in annual installments over a period of seven years, without interest. Discounted at six per cent, the discount would be $46,704.

(5) Disregarding the postponement, not compensated by any interest, shown in item 4, the reduction of principal, and of interest already accrued, as shown in items 1 and 2, amounted to $74,749.63.

(6) If Seabrook exercised its option and paid the taxpayer $10,000 for its stock, the taxpayer's loss of money currently due or the payment of which was secured would be reduced from $74,749.63 to $64,749.63.

It is evident that this whole complicated Seabrook transaction was a package transaction, the details of which were those which Seabrook desired and which the taxpayer was willing to accede to. We can think of no reason why the taxpayer would have desired to retain four per cent of the stock which, because it was optioned to Seabrook, represented no equity in Santa Clara, if it had had the alternative choice of receiving $10,000 or some lesser but substantial part of the accrued interest which it forgave, instead of the stock. The government's argument that, after all, the taxpayer did keep the stock and did get $10,000 for it in 1960 seems to us to contradict the admonition of its Regulation Sec. 1.1651–1, which says, with regard to losses, "Substance and not mere form shall govern in determining a deductible loss."

 The regulation just referred to also says:

"(b) *Nature of loss allowable.* To be allowable as deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year."

This regulation, of course, does not mean that a worthless security loss must be evidenced by a completed transaction such as a sale, since if the security is worthless no one would buy it and, at any rate, if there were a sale the deduction would be covered by Section 165(f). In the instant case the Tax Court found that Santa Clara had done the things which we have recited earlier in this opinion, all of which were consistent only with a definite decision on Santa Clara's part to go out of business. The things done were tangible, unequivocal, readily subject to verification and uncontradicted by any evidence. They were "identifiable events," within the meaning of the regulation.

The objective facts in the instant case are, for all practical purposes, undisputed. We think that the Tax Court, largely because of an erroneous view of the effect of the existence of a going concern value, hereinabove discussed, drew an erroneous inference from the undisputed facts. We therefore, with deference, draw a contrary inference from the evidence. McGah v. Commissioner, 9 Cir., 210 F.2d 769, 771. See also Gillette's Estate v. Commissioner, 9 Cir., 182 F.2d 1010, 1011–1012.

The decision of the Tax Court is reversed.