**FIGGIE INTERNATIONAL, INC., (Successor by merger to Mid Continent Manufacturing Co., Inc. and Subsidiaries), Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 85–1864.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 25, 1986.

Decided Dec. 1, 1986.

Rehearing Denied Feb. 23, 1987.

Andre M. Saltoun, Baker and McKenzie, Chicago, Ill., Neal J. Block (argued), James M. O'Brien, for petitioner-appellant.

Fred T. Goldberg, Jr., Chief Counsel, I.R.S., Michael L. Paup (lead counsel), Glenn L. Archer, Jr., Tax Div., Dept. of Justice, Marlene Gross, Acting Director-Tax Litigation, Office of Chief Counsel-I.R.S., Washington, D.C., Roger M. Olsen, Richard Farber, Bruce Ellisen (argued), for respondent-appellee.

Before MARTIN, GUY and NORRIS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Petitioner appeals an adverse judgment of the United States Tax Court for a deficiency assessed in tax year 1968. Two issues are presented: whether the stock of Huber-Warco, a former subsidiary of petitioner, became worthless during the taxable year ending June 30, 1968, or at any time; and whether, in the event that the Huber-Warco stock did not become worthless, petitioner is entitled to deduct the fair market value of the Huber-Warco stock as an ordinary and necessary business expense. For the reasons stated below, we affirm.

The petitioner is the successor by merger to Mid-Continent Manufacturing Company. Mid-Continent, in turn, was the successor to Huber Corporation.

Huber-Warco was a Brazilian corporation engaged in the manufacture and sale of road construction equipment and spare parts in Brazil. Huber-Warco was a wholly owned subsidiary of Huber Corporation. Huber's cost basis in the Huber-Warco stock for the years in question was $1,149,-115.19. During March, 1960 and January, 1961, Huber loaned Huber-Warco $266,000 and $1,958,355, respectively, at 8% interest, payable on demand.[1]

From the onset of commercial production during 1960 through 1967, Huber-Warco was operated at a loss or at a marginal profit. The company's profitability suffered for a variety of reasons, including serious management and production problems, but ultimately its profitability was dependent upon the amount of Brazilian government spending for road construction.[2]

In 1965, Huber began concerted efforts to sell Huber-Warco. Over the course of the next two years, Huber unsuccessfully negotiated the proposed sale with several parties. Initially, Huber's asking price for its interest in Huber-Warco was approximately $4,000,000; by August, 1967, this price was reduced to $2,500,000 and Huber was also willing to forgive the amounts due under the registered loans. Despite these efforts, Huber was unable to find a willing buyer.

In 1966, Richard Mozer was appointed as general manager of Huber-Warco. Mozer proved to be an excellent general manager, and under his control, Huber-Warco acquired, over its principal competitor, a dominant share of the Brazilian motor grader market.

Prior to June, 1967, Huber-Warco had not been able to repay the outstanding principal and accrued interest due on the registered loans in the ordinary course of business.[3] As of June 30, 1967, Huber-

| | |
|---|---|
| Oct. 31, 1964 | (658,393) |
| Oct. 31, 1965 | 281,992 |
| Oct. 31, 1966 | 233,627 |
| June 30, 1967** | (353,710) |

\* This amount represents Huber-Warco's accumulated deficit as of October 31, 1961.

\*\* This unaudited financial statement covers the eight months ended June 30, 1967.

1. Huber registered the two loan agreements with the Central Bank of Brazil. Registration of the loan agreements allowed Huber-Warco to remit principal and interest to Huber in U.S. dollars, a privilege otherwise prohibited by Brazilian currency restrictions.

2. The following chart shows the net profit or loss in U.S. dollars for Huber-Warco for its fiscal and taxable periods through June 30, 1967:

| Year Ended | Profit/Loss |
|---|---|
| Oct. 31, 1961 | ($1,040,444)* |
| Oct. 31, 1962 | (279,443) |
| Oct. 31, 1963 | (348,918) |

3. Between June, 1967 and February, 1968, liquidation of Huber-Warco to repay the registered loans was not a feasible option for Huber. During this period, Huber-Warco did not have sufficient current assets to liquidate both its current liabilities and the principal and accrued interest

Warco had paid $235,511.43 of the total accrued interest and $11,755 of the principal due under the loans. On July 31, 1967, Huber-Warco owed a total of $3,054,927 in principal and accrued interest.

Beginning in approximately June, 1967, Huber-Warco's fortunes began to change. The company recorded profits in 8 of the 9 months between June 30, 1967 and February 29, 1968, producing a total profit of $832,500 after payment of current interest due on the loans. During this same period, Huber-Warco's net worth increased from a loss of $388,126 to $354,764, and its net current assets increased from $210,946 to $1,059,931.

During August, 1967, Richard Mozer and another director of Huber-Warco, Carlos Stroeter (the Mozer group), notified Huber of their interest in acquiring Huber-Warco. After several months of negotiation, Huber agreed to sell Huber-Warco to the Mozer group on the following terms: (a) remittance of the remaining past due interest in the amount of $367,859.46 by March 1, 1968; (b) current monthly remittance of interest accruing on the outstanding balance of the registered loans; (c) execution of a Transfer Agreement by March 31, 1968; (d) execution of an Escrow Agreement requiring the Mozer group to deposit $100,000 earnest money and Huber to deposit all of its shares of the Huber-Warco stock; (e) repayment of the $2,212,614.48 outstanding principal on the registered loans either (1) in its entirety on or before September 30, 1968, or (2) one-half of the principal on or before September 30, 1968, and the remainder, with 8% interest there-

on, payable on or before June 30, 1969; (f) the purchase would not be considered final until a Licensee, Royalty and Technical Assistance Agreement had been executed; and (g) the purchase would not be considered final until the outstanding principal of the registered loans was paid in full.[4] Mozer and Stroeter formed Cia de Fomento E Ingenieria Interamericana, S.A. (CIFISA), a Panamanian corporation, to enter into the transfer agreement with Huber. The agreement was executed on March 10, 1968. CIFISA was able to cause Huber-Warco to repay the registered loans in full prior to February 14, 1969, and on that date, CIFISA became the 100% shareholder of Huber-Warco.

For its taxable year ended June 30, 1968, petitioner claimed a $1,485,057.18 worthless stock loss with respect to its disposition of the Huber-Warco stock.[5] In a notice of deficiency dated June 22, 1979, the commissioner disallowed the petitioner's claimed worthless stock loss. Petitioner filed a petition with the Tax Court on August 30, 1979, asserting its entitlement to the worthless stock loss deduction; in an amended petition, petitioner alleged, in the alternative, that Huber had transferred the Huber-Warco stock to CIFISA in exchange for valuable consideration and was entitled to a business expense deduction for its 1969 taxable year in the amount of the stock's fair market value on the date of the exchange. The trial court rejected both of petitioner's arguments.

## I.

The first issue is whether the stock of Huber-Warco became worthless during the

---

on the registered loans. Moreover, liquidation would have had a substantial negative impact on Huber's trademarks and goodwill in the international market. Approximately 30 percent of Huber's sales occurred outside the United States, and Huber had License Agreements with licensee-manufacturers in six foreign countries. Brazil was the only market in the world where Huber's motor graders outsold Caterpillar products.

**4.** As a condition precedent to the release of the Huber-Warco stock from escrow, the Mozer group was required to register the Technical Assistance Agreement with the Central Bank of

Brazil. Registration permitted Huber-Warco to remit to Huber royalties due under the agreement in U.S. dollars, and to deduct such royalties for Brazilian tax purposes. Registration was commenced during October, 1968, and the Central Bank issued a certificate of registration during December, 1968.

**5.** On its return for the period ended June 30, 1964, the taxpayer claimed that its basis in the Huber-Warco stock was $1,485,057.18. The tax court found that the taxpayer's basis in the Huber-Warco stock was $1,149,115.19.

fiscal year ending June 30, 1968. The Internal Revenue Code, 26 U.S.C. § 165(g)(1), generally provides that if a "security" becomes worthless during the taxable year, the resulting loss shall be treated as a loss from the sale or exchange of a capital asset. Section 165(g)(3) provides, however, that "[f]or purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset." In that case,

> [i]f a taxpayer which is a domestic corporation owns any security of a domestic or foreign corporation which is affiliated with the taxpayer ... and such security becomes wholly worthless during the taxable year, the loss resulting therefrom may be deducted under section 165(a) as an ordinary loss in accordance with paragraph (b) of this section.

Treas.Reg. § 1.165–5(d)(1).

■ Since it was undisputed that Huber's stock in Huber-Warco was ownership of a security of an affiliated corporation, the question was whether the stock of Huber-Warco became wholly worthless during 1968, thus entitling Huber to an ordinary loss deduction to the extent of its cost basis. The burden of establishing worthlessness is on the taxpayer. *Royal Packing Co. v. Comm'r*, 22 F.2d 536 (9th Cir. 1927). The tax court set forth the test for determining whether the stock was worthless:

> The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has potential value and can not be said to be worth-

less. The loss of potential value, if that exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

*Morton v. Comm'r*, 38 B.T.A. 1270, 1278–1279 (1938), *aff'd* 112 F.2d 320 (7th Cir. 1940).

■ The tax court determined that the stock did not become worthless at any time during 1968. While declining to fix the fair market value of the stock, the court found that Huber-Warco stock clearly had potential value.

In support of this conclusion, the tax court first noted that beginning in June, 1967, Huber-Warco's fortunes had begun to change. The company recorded a profit after payment of current interest on the registered loans during the 9 month period from June 1967 to February 29, 1968, and during that same period, Huber-Warco's net worth and net current assets increased significantly. Thus, the evidence showed that by the date the transfer agreement was executed on March 10, 1968, Huber-Warco's future looked promising.

Second, Huber-Warco's management firmly believed that through aggressive management and projected Brazilian government spending, Huber-Warco could pay off the loans and become profitable. In fact, Huber-Warco did pay off the loans in a timely manner.

Third, the tax court found that Huber negotiated the sale with tax consequences in mind, and therefore, Huber's decision to accept no money for the stock could not be considered as evidence that the stock was worthless. The court noted that Huber had received other valuable consideration in exchange for the stock, including repayment of the loans, the execution of the technical assistance agreement, and its registration with the Central Bank of Brazil. Accordingly, the tax court found that the Huber-Warco stock had, at least, potential value on the date it was transferred to CIFISA.

Petitioner asserts that the transfer agreement constituted an identifiable event which unequivocally terminated the stock's potential value to Huber. Petitioner points to Huber-Warco's history of operating losses, the stock's negative liquidating value, Huber's repeatedly unsuccessful attempts to sell Huber-Warco's stock to third parties and CIFISA's absolute refusal to pay any cash for Huber-Warco, as establishing that the Huber-Warco stock possessed no potential value to Huber.

These factors do not convince us that the tax court's determination was clearly erroneous. *Boehm v. Comm'r*, 326 U.S. 287, 293, 66 S.Ct. 120, 124, 90 L.Ed. 78 (1945). Although Huber-Warco did operate at a loss or slight profit for several years, at the time of the transfer the situation had improved substantially. In addition, the fact that the stock may have had a negative liquidating value is not determinative as to whether the stock has potential value.[6] To the contrary, CIFISA's confidence in its ability to pay off the registered loans negates any such inference that they believed the stock to be worthless. Finally, while Huber's failure to sell the company is some evidence in support of petitioner's argument, that fact is insufficient, on this record, to persuade us that the tax court's finding of potential value was error.

Petitioner's reliance on *Ainsley Corp. v. Comm'r*, 332 F.2d 555 (9th Cir.1964) is misplaced. Whether a security has become worthless is a question of fact requiring consideration of all pertinent facts and circumstances. *Boehm*, 326 U.S. at 292. At least one important distinction between *Ainsley* and the instant matter is that the subsidiary involved there had never operated at a profit, and in fact had a history of several years of uninterrupted and "ruinous" operating losses. 332 F.2d at 557.

Accordingly, the tax court's finding that the Huber-Warco stock was not wholly worthless in 1968 is not clearly erroneous.

## II.

■ Petitioner also challenges the tax court's determination that it is not entitled to deduct the fair market value of the Huber-Warco stock as an ordinary and necessary business expense. Petitioner argues that reduced to its essentials, this is simply an instance where property, i.e., stock, was exchanged for services, and that such a transaction constitutes a deductible expense. Petitioner asserts that first, the stock was exchanged for CIFISA's undertaking to manage Huber-Warco in a manner which resulted in Huber's collecting the outstanding debt, a feat that Huber had not been able to accomplish. Essentially, petitioner urges, the stock was transferred in exchange for debt collection services. Second, Huber acquired Mozer's personal guarantee of Huber-Warco's indebtedness. Third, by executing the transfer agreement, Huber ensured the continued operation of Huber-Warco for an indefinite period, which preserved, protected and promoted the value of Huber's existing goodwill, trade name and trademarks. Petitioner concludes that because Huber transferred the stock to CIFISA as payment for the above business expenses, the law allows Huber a deduction equal to the fair market value of the stock transferred and Huber must recognize capital gain or loss equal to the difference between the stock's fair market value and its basis in the stock.

The tax court rejected petitioner's argument for two reasons. First, although the parties had stipulated that the fair market value of the stock on the date of transfer was $3,000,000, the tax court disregarded the stipulation, finding it to be clearly contrary to the record. Instead, the tax court determined that the stock was of *de minimis* value on the date of transfer. Second, the court found that even if the Huber-Warco stock had a fair market value on the date of transfer, any services performed by CIFISA were incidental to the sale and not deductible under § 162. Petitioner vigorously challenges both of these determinations.

We need not determine whether the tax court correctly disregarded the parties'

---

**6.** The tax court did not determine the liqui-   dation value of the stock.

stipulation as to the fair market value of the stock, as we agree with the tax court that the stock was transferred as a sale transaction, and not in payment for services.

As to petitioner's argument that it transferred the stock in exchange for debt collection services, i.e., CIFISA's "causing" Huber-Warco to repay the loan, we must reject this characterization. It was not the services being rendered which triggered the stock transfer, but the actual payment of the loans. No matter how earnestly CIFISA worked at "collecting the debt," if it were not successful, the stock would not have been transferred. Thus, it was not the services that Huber was interested in, but the payment of money in the form of the loan being paid off.

It is also clear that petitioner did not transfer the stock in consideration for the "service" of obtaining certification of the technical assistance agreement. The record indicates that this event was a condition precedent to transfer of the stock. In other words, the Huber-Warco stock would not have been transferred without such certification; it cannot therefore, be considered payment for services rendered.

Moreover, the record discloses that Huber, immediately before the sale to CIFISA, had been negotiating to sell Huber-Warco on substantially similar terms to other buyers. Huber was willing to sell its interest in Huber-Warco for $2.5 million in cash, along with execution of a technical assistance agreement. This factor supports the tax court's conclusion that Huber's arrangement with CIFISA was simply a different way to arrange the sale of Huber-Warco, rather than being payment for services rendered.

As to Mozer's personal guarantee of payment, we agree with the tax court that this was only incident to the sale. The record supports the conclusion that Mozer personally did not have sufficient money to repay the registered loans. Stroeter testified

that the Mozer group sought to structure the transaction as they did because they did not have any money. In addition, in order to obtain the $100,000 to put in escrow at the time of execution of the transfer agreement, Mozer was forced to borrow the money at an 1,000% interest rate.[7]

As to the fact that execution of the transfer agreement ensured the continued operation of Huber-Warco and protected Huber's goodwill and trade name, the question is closer. The record supports a finding that Huber felt that continued Brazilian operations were important to its goodwill and trade name. In fact, Huber refused to liquidate Huber-Warco, even while losing money, for that reason. At the same time, we agree with the tax court's rejection of this argument for two reasons.

First, as noted below, CIFISA was under no obligation to continue operating Huber-Warco; rather, it was free to liquidate once the loans were paid. Second, we believe that the realities of the situation dictated that any buyer continue to operate, if at all, as Huber-Warco. For instance, we note that Huber sought a technical assistance agreement as a condition of sale to anyone. In addition, Brazil was the only market in the world where Huber products, or perhaps any company's products, outsold Caterpillar products. Huber-Warco captured 60% of the market. In reality then, the most feasible method of operation was to continue the company as it existed.

We have carefully reviewed the record and briefs of the parties in this matter, and we do not believe that the tax court erred. Accordingly, the judgment of the tax court is AFFIRMED.

---

7. The tax court also found in this regard that the risk of Huber-Warco not repaying the loan was quite low. Although we disagree with this determination, it does not affect our conclusion that Mozer's guarantee was incidental to the sale.