# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07-3593

ALAN BILTHOUSE and PATRICIA BILTHOUSE,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 4442—**Virginia M. Kendall**, *Judge.*

ARGUED MAY 15, 2008—DECIDED JANUARY 15, 2009

Before RIPPLE, KANNE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Alan and Patricia Bilthouse seek to recover a tax refund on the basis that their shares of stock in a construction company became "worthless" in 1997 and were therefore "dispose[d] of" under 26 U.S.C. § 469(g). The government denied the refund on the basis that the company became worthless in 1995 rather than 1997. The Bilthouses do not dispute that the company

had no liquidating value in or after 1995 but contend that the company expected a large financial recovery from a lawsuit that would have allowed it to stay in business. Because the record does not demonstrate that the lawsuit represented a reasonable possibility that the company would remain in business after 1995, we affirm the district court's decision granting the government summary judgment.

## I. BACKGROUND

In March 1993, the Bilthouses bought stock in a construction company called S&E Contractors, Inc. ("S&E") for $500,000. S&E was a heavy construction contractor that performed public works projects for the State of Florida and its cities and towns. In order to bid on these public construction projects, S&E was required to obtain construction bonds. S&E obtained bonding through two sureties: Fireman's Fund Insurance Company and Safeco Insurance Company.

From April 1994 through June 1995, S&E suffered millions of dollars in losses as a result of cost overruns on a large construction project for the City of Jacksonville called the North Landfill Project. In 1995, S&E became financially insolvent and defaulted on its bonds, which meant it had to seek the assistance of its bonding companies to complete its bonded contracts. S&E's open projects were completed under the terms of its agreements with the bonding companies, which collected the revenue from the projects. As a result, S&E had little to no cash flow.

Also in 1995, S&E decided not to bid on any more bonded work, and both of its bonding companies stopped issuing bonds to S&E for new public construction projects. Dean Akers, who was engaged by S&E as a consultant in the spring of 1995, and who became its president later that year, testified that this was a temporary measure; S&E intended to stop seeking new government projects only until it could obtain new bonding. However, there is no evidence that S&E tried to obtain new bonding after 1995.

In the fall of 1995, S&E filed a lawsuit against the City of Jacksonville to recover its financial losses from the North Landfill Project. The suit was settled in 1997 with neither S&E nor either bonding company receiving any money.

S&E had elected to be taxed as a subchapter S corporation, which means its income flows through and is taxed as income to the corporation's shareholders individually. *See* 26 U.S.C. § 469; *see generally St. Charles Inv. Co. v. Comm'r*, 232 F.3d 773, 775 (10th Cir. 2000). In 2001, Alan Bilthouse and his wife Patricia Bilthouse filed for a refund of paid income taxes with the Internal Revenue Service based on their claim that their shares in S&E became worthless in 1997 and therefore were "dispose[d] of" at that time. The IRS denied the Bilthouses' refund and the Bilthouses sued to recover the refund in federal court.

The district court granted summary judgment to the government, holding that the Bilthouses had failed to meet their burden of demonstrating that S&E became "worthless" in 1997 rather than in 1995. The Bilthouses appeal that decision.

## II. ANALYSIS

This case comes to us on appeal from a grant of summary judgment, which we review de novo, drawing all inferences in favor of the nonmoving parties. *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977 (7th Cir. 2008). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The Bilthouses are "passive investors" in S&E, which means they invested in a business in which they did not materially participate. 26 U.S.C. § 469(c). S&E Contractors is an S corporation so pursuant to section 469, the Bilthouses could deduct losses stemming from their investment in S&E but only to the extent of their passive income. 26 U.S.C. § 469(d); *see also* 5 Mertens Law of Federal Income Taxation § 24C:3 (2008) ("[A] taxpayer cannot deduct losses from business activities in which he or she does not materially participate . . . unless he or she reports passive income on the tax return against which to offset the losses.").

However, surplus losses from passive activity are suspended and carried over from year to year. Previously suspended losses may be available to offset other income without regard to the passive loss rules if the taxpayer's "entire interest in any passive activity" is "dispose[d] of" in a taxable transaction. 26 U.S.C. § 469(g); *see also St. Charles Inv. Co.*, 232 F.3d at 776. Here, the Bilthouses seek to take advantage of section 469(g) to deduct previously suspended passive activity losses

arising from their investment in S&E. The parties agree that the Bilthouses' entire interest in S&E was "dispose[d] of" for purposes of section 469(g) whenever their stock in the corporation became "worthless." *See* 26 U.S.C. § 165(g) ("If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset."). But the parties disagree as to when the stock became worthless. The Bilthouses contend their stock became worthless in 1997 (which, due to a number of circumstances not relevant to this case, would result in a large tax deduction) while the government contends the stock became worthless two years prior, in 1995.

So the crucial question in this case is when exactly S&E (and therefore its stock) became worthless. The worthlessness of a stock as of a particular year is a factual inquiry, varying according to the circumstances of each case. *Boehm v. Comm'r*, 326 U.S. 287, 293 (1945); *see United States v. Davenport*, 412 F. Supp. 2d 1201, 1207 (W.D. Okla. 2005). Although section 165(g) does not define "worthless," most courts consider both the liquidating value and the potential value of the company to determine the year of worthlessness. *See Morton v. Comm'r*, 38 B.T.A. 1270, 1278 (B.T.A. 1938), *aff'd* 112 F.2d 320 (7th Cir. 1940) (worthlessness of stock depends on current liquidating value and potential value); *see also Delk v. Comm'r.*, 113 F.3d 984, 986 (9th Cir. 1997); *Figgie Int'l, Inc. v. Comm'r.*, 807 F.2d 59, 62 (6th Cir. 1986).

Even where a company has no liquidating value, evidence of potential value can be used to demonstrate that a company is not yet worthless during a particular year. If a company's assets are less than its liabilities but "there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has potential value" and cannot be said to be "worthless." *Morton*, 38 B.T.A. at 1278; *Delk*, 113 F.3d at 986.

However, a taxpayer relying on the potential value of a company to put off the year of worthlessness must provide objective evidence of this value; merely asserting his self-serving hopes will not do. *See Boehm*, 326 U.S. at 293; *Davenport*, 412 F. Supp. 2d at 1207. In *Boehm*, the Supreme Court held that "a determination of whether a loss was in fact sustained in a particular year cannot fairly be made by confining the trier of facts to an examination of the taxpayer's beliefs and actions." 326 U.S. at 292; *see also Keeney v. Comm'r*, 116 F.2d 401, 403 (2d Cir. 1940) (a taxpayer cannot "postpone his claim of loss until only an 'incorrigible optimist' would fail to know that the stock had become worthless at an earlier date.").

We are mindful that the Bilthouses bear the burden of establishing that S&E was not worthless until 1997. *See Boehm*, 326 U.S. at 293 (taxpayer bore the burden of establishing the fact that there was a deductible loss in 1937 rather than in the prior year). This means that the Bilthouses must demonstrate that S&E retained some value, either present or potential, until 1997.

The Bilthouses do not present any evidence that might demonstrate that S&E had liquidating value after 1995. In contrast, the government presents evidence that in 1995, S&E became financially insolvent, defaulted on its bonds, and turned to the bonding companies to finance the completion of its bonded work, at which point the bonding companies stopped issuing bonds to S&E for new projects. Because of S&E's default, the bonding companies took control over the revenue from S&E's open projects. S&E reported a loss of $18,377,151 on its tax returns for that year.

Instead, the Bilthouses maintain that S&E retained potential value through 1995 and up until 1997 because during that time, the company expected an award of $15 to 27 million from the Jacksonville lawsuit. Had such an award been given, the Bilthouses contend that S&E would have been able to resume its operations after 1995. Of course, the lawsuit ultimately was resolved unfavorably for S&E in 1997, and it received no money from the litigation. But according to the Bilthouses, the death knell did not sound for S&E until *that particular event* occurred, and therefore S&E did not become worthless until 1997. They also argue that S&E maintained its worth by pursuing private construction projects through 1996 and 1997. We address each argument in turn.

### A. The Jacksonville lawsuit does not demonstrate that S&E retained potential value after 1995.

The linchpin of the Bilthouses' argument is that two S&E presidents, S&E's bonding companies, and its bank all

expected a recovery from the lawsuit, and they expected the recovery to be sufficient to repay the bonding companies and allow S&E to again obtain bonding for new government projects. In other words, they believed the lawsuit would save S&E. However, as the Supreme Court has already noted, a determination of when a particular loss was sustained cannot be made based on subjective beliefs alone. *See Boehm*, 326 U.S. at 292. As discussed further below, the Bilthouses present no objective evidence to demonstrate the reasonableness of the belief that the lawsuit represented potential value for S&E, and without that, they cannot meet their burden. *See, e.g., Morton*, 38 B.T.A. at 1278 (taxpayer must demonstrate a "*reasonable* hope and expectation that the assets will exceed the liabilities of the corporation in the future") (emphasis added).

In their affidavits, Douglas Ebbers (former president of S&E) and Dean Akers (consultant and president of S&E from 1995 through 1997) state that had the lawsuit been successful, S&E would have been able to resume bidding on contracts. Akers further states that S&E and its bonding companies operated on the premise that a favorable resolution of the litigation would provide a cash infusion "sufficient to repay the sureties and keep S&E a viable company." The Bilthouses also submitted evidence that an outside consultant valued the lawsuit to be worth over $20 million.

But neither Ebbers nor Akers provides a basis for why anyone thought the lawsuit would be successful. We know nothing about the merits of the lawsuit or whether

S&E's damages estimate was reasonable. Indeed, we do not even know how the estimated damages were calculated.[1] Evidence that S&E's two presidents believed the lawsuit would prevail and that it would save S&E does not by itself demonstrate that their belief was reasonable. For all we know, they could have been unusually optimistic. *See, e.g., Boehm*, 326 U.S. at 294-95 (upholding tax court's determination that stockholders' suit had no value where there was no evidence regarding "the merits of the suit, the probability of recovery or any assurance of collection of an amount sufficient to pay the creditors' claim of more than $630,000 and to provide a sufficient surplus for stockholders so as to give any real value to their stock.").

The actions of the bonding companies and S&E's bank are no more probative of the potential value of S&E. The Bilthouses point out that although the bonding companies and the bank "could have" stopped dealing with S&E in 1995, they chose to work with S&E until 1997. The Bilthouses contend that this was because they were waiting to see what happened with S&E's lawsuit, and that a jury could infer from this show of support that S&E had a viable case and a reasonable expectation of recovery. But there are several possible explanations for the behavior of the bank and the bonding companies that have nothing to do with the value of the company or even the value of the lawsuit. And even if they were motivated

---

[1] We note that the damages estimate seems a bit high given that the original contract amount on the project was $12 million.

by the prospect of recovery from the lawsuit, we do not know the basis for their putative belief that the lawsuit would be resolved favorably or that the expected recovery would be sufficient to allow S&E to resume its prior operations.

Contrary to the Bilthouses' assertion, a company's hope that it will prevail in a lawsuit is not the same for purposes of this analysis as a company's reasonable expectation that its future operations will succeed. *Cf. Miami Beach Bay Shore Co. v. Comm'r*, 136 F.2d 408 (5th Cir. 1943) (stock in company was not "worthless" in 1936 because there was a reasonable prospect of reorganization until 1937 when the stockholders resolved to liquidate the company instead); *Benjamin v. Comm'r*, 70 F.2d 719 (2d Cir. 1934) (stock in soapstone company not "worthless" in 1926 because it continued to take options and explore and drill for new sources of soapstone into 1927). That is because no reasonable investor would buy stock in an otherwise worthless company based on such an inherently speculative endeavor. At minimum, an investor would need to know more about the lawsuit before investing in such a company. For example, if the president of S&E had bought lottery tickets from 1995 until 1997 with the belief that a winning ticket would save S&E, that would not demonstrate that S&E had potential value during those two years because it is purely speculative that he would win the lottery.

By 1995, S&E knew there would be no foreseeable future operations unless it could pay off its bonding companies. Although S&E may have hoped the Jacksonville lawsuit would enable it to recover, there is no rea-

sonable ground (as far as we can tell) for that hope. To allow a jury to make a determination of worth based on the subjective beliefs of S&E insiders and entities connected to it would subject this tax provision to endless manipulation. *Cf. Boehm*, 326 U.S. at 293 ("The taxpayer's attitude and conduct are not to be ignored, but to codify them as the decisive factor in every case is to surround the clear language of [28 U.S.C. § 23(e)] and the Treasury interpretations with an atmosphere of unreality and to impose grave obstacles to efficient tax administration.").

### B. The private construction projects do not demonstrate that S&E retained potential value after 1995.

The Bilthouses also contend that S&E continued business operations through 1995 and 1996 by pursuing and working on private construction projects through SCI, a division of S&E. (Recall that S&E could not work on public projects because the bonding companies stopped issuing bonds for new projects in 1995.) This is a closer issue because continued operations of a company might indicate that there was a reasonable hope and possibility of success. *See Benjamin*, 70 F.2d at 719-20 (soapstone company that continued to take options and explore for soapstone even after shutting down its mill in 1926 did not become worthless for tax purposes until 1927).

However, there is no objective evidence in the record that would allow us to ascertain whether SCI could have saved S&E. The Bilthouses provide no evidence of how much work SCI was doing, whether it was viable, or whether it reasonably could have generated enough

money at some point to allow S&E to pay off the bonding companies and resume its public projects. Indeed, by the Bilthouses' own admission, the mainstay of S&E's business was its public work, for which it needed to obtain construction bonds. In other words, the Bilthouses have not demonstrated that SCI represented "a reasonable hope and expectation" that the assets of S&E would exceed its liabilities in the future. *Morton*, 38 B.T.A. at 1278-79; *see also Keeney*, 116 F.2d at 403 (while a taxpayer may have "hoped" to make money by holding races, there was "no reasonable ground for hoping by that [this would] liquidate that enormous debt; and only so would the stock become of any value.").

We acknowledge that there was no definitive event in this case that might have signaled to investors in 1995 that their shares in S&E had become worthless. But our examination of the facts and circumstances in this case leads us to conclude that the Bilthouses have not met their burden of demonstrating that S&E became worthless in 1997 rather than 1995. To the extent there was some possibility that S&E could have pulled itself out of the mess it found itself in by 1995, the record does not demonstrate that the possibility was reasonable rather than remote. As a result, we need not reach the Bilthouses' argument regarding damages.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.